**Malcolm Scott HARRIS, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. 6580.

Court of Appeals of Alaska.

Feb. 24, 1984.

Steven P. Oliver, Anchorage, for appellant.

Charles M. Merriner, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C.J., COATS and SINGLETON, JJ.

COATS, Judge.

On the evening of December 11, 1980, Bob Mitchell, Malcolm Harris, and Richard Farmer drove to Clark Garvin's home in Anchorage in order to buy cocaine. Since Garvin was not at home, Mitchell kicked in the door. Mitchell and Farmer returned to the car after a few minutes with about two pounds of marijuana, some cocaine, a set of scales, and $14,000 worth of traveler's checks.

In order to cash the traveler's checks, Harris obtained a birth certificate form which he completed in the name of Clark Garvin. He then obtained a State of Alaska identification card in the name of Clark Garvin. He forged Garvin's name on the traveler's checks. Mitchell and Harris then flew to Seattle, where Harris forged Garvin's name to the checks. Mitchell and Harris cashed thousands of dollars worth of checks in Seattle. After returning to Anchorage, Harris's brother cashed about $2,000 worth of the checks.

On November 4, 1981, a jury found Harris guilty of theft in the second degree and forgery in the second degree. Judge Ripley sentenced Harris to an aggregate term of eight years with five years suspended. Harris was also ordered to pay restitution in an amount not to exceed $7,000. Harris has appealed to this court raising several issues concerning his conviction and sentence. We affirm.

## GRAND JURY COMPOSITION

██ Harris first contends that the grand jury which returned the indictment against him was improperly constituted and therefore the indictment should have been dismissed. Before trial, Harris's counsel filed an affidavit in which he stated that he had been informed by court personnel that one grand juror resided 176 miles from the

Anchorage courthouse and that two other grand jurors were from Palmer.[1] Harris claims that at least one of the grand jurors and perhaps all three served in violation of Alaska Rule of Criminal Procedure 6(c)(1) which requires grand jurors to be "selected from the population within a fifty-mile radius of the place where the grand jury is convened...." We conclude that even if the three jurors were selected from beyond a fifty-mile radius of the Anchorage courthouse, this is not the sort of error which should lead to the dismissal of an indictment. There is no showing that there was any systematic exclusion of any class or group from the grand jury or that Harris was prejudiced in any conceivable way. *Peterson v. State*, 562 P.2d 1350, 1366 (Alaska 1977). *See* AS 9.20.040.

## STATEMENTS

Harris next argues that the trial court erred in failing to suppress two inculpatory statements.

### The Anchorage Statement

Harris was arrested in Anchorage on a fraud warrant and taken to the Anchorage police station where he was interviewed by Detective Starr Campbell of the Anchorage Police Department. Harris was interviewed for about one-half hour, but only the last seven minutes of the statement were recorded. Harris contends that he originally refused to talk to the police but that after the police made certain promises and threats he made an initial inculpatory statement. He claims that only then was he warned of his rights and made the tape recorded statement. Detective Campbell testified that before he asked Harris any questions, he read Harris his rights from a form and that Harris signed the form and acknowledged that he understood his rights. Detective Campbell testified that he told Harris he would inform the District Attorney of any cooperation. He also stated that he might have told Harris that the

---

1. The record does not establish whether these particular grand jurors lived within 50 miles of the Anchorage courthouse.

District Attorney would take Harris's cooperation "into consideration." Detective Campbell also testified that he tells most of the suspects he interviews that those with no prior convictions usually get deferred prosecutions.

### The Homer Interview

About one month after the Anchorage interview, Harris was arrested in Homer and was interviewed by Homer Police Chief Michael Daugherty. The arrest was on an unrelated misdemeanor charge. A major portion of this interview was videotaped. Harris claims that the statement which he made was the product of threats and coercion. Harris claims that he was threatened with a sexual assault charge and that Daugherty promised to help him if he confessed. The following are some critical statements which took place in the interview:

Q: (Daugherty) You have a problem with a felony sexual assault. That's what it's called.

A: (Harris) Am I being charged with it?

Q: (Daugherty) I don't know if you're going to be charged with it at this point or not. It's got to be run by the D.A. There's a good chance of it.

 * * * * * *

Q: Now, I'm willing to help you out, you know, I've been twenty-one myself, and just like I told you, *I'm willing to help you out, but in order to do that you're going to have to come clean with me.* You're going to have to be square with me. You see, I've been in this business a long, long time, you know, you were in grade school when I first started in this business, so I've talked to lots of people, I'm very experienced at what I do, I know what I'm doing, you don't, and *right now you're not telling me the truth.*

A: About what?

Q: About the checks. The checks have been examined by experts—the traveler's checks. ...

A: Uh-huh.

Q: [A]nd they have positively identified the signatures on those as your handwriting.

A: *It's not my handwriting.*

Q: *It has to be,* the expert said it was yours.

A: I had signed a couple of those checks. I had signed a couple of those checks before they went into the bank, but Bob signed most of those checks.

Q: Well, how many did you sign?

A: I—I don't even remember. Maybe a hundred of them.

Q: You signed—you forged Clark Garvin's name to a hundred of the checks is all? You're sure that's all?

A: Yeah.

Q: Okay. How many did—did—did Bob Mitchell sign?

A: The rest of them. My brother signed some of them when he cashed in on them.

Q: He also forged Garvin's signature.

A: I don't know—I don't know if my brother forged Clark Garvin's signature. I think Bob had written them in and then put pay to the order.

Q: Scott, let me tell you something. *It doesn't make any difference if you signed one or a thousand, you know.* What I'm trying to tell you is be completely honest, let's get this thing out in front. Get it off your chest because it doesn't make any difference if—as long as you signed one—and you told me you'd signed a hundred—*so it doesn't make any difference if you signed all the rest of them.* Why don't you just be honest and let's get it out forward and just admit it because you did it, didn't you?

A: I signed half of them, yeah.

Q: *You signed them all.*

A: I didn't sign all of them.

Q: The experts say that you signed them all—all of the signatures are yours.

A: I didn't sign them all, I signed at least half of them.

Q: *Probably more than half.* There are a few checks that they don't have back yet. Okay? Now, come on, I've been playing fair with you, you play fair with me, all right? *Now, you signed at least eighty-percent of them,* didn't you?

A: (Indiscernible)

Q: Okay. And maybe even more, is that not right?

A: *About eighty percent of them.*

(Emphasis added.)

Daugherty said that Harris's "only hope" was to tell him everything he knew about the Garvin case.

Q: Well, your only hope right now is to tell me everything you know about it. Now, how can I impress upon you to do that? *I'm not your enemy, I'm trying to help you.* All right? I've seen a hundred—I've seen a thousand young men in the same shape that you're in right now and let me tell you, the only thing that's going to help you right now is honesty. Because we have a lot of evidence on you. *Now, I'm willing to help you on the other things.* I'm not going to be trying to really put it to you on the credit cards. And on the—you know, on this thing—of course, I'm going to run a thing about the sexual relations with the minor by the district attorney, *but I'm not going to be standing strong on one side of the fence or the other.* Now, I can help you on here by just—and I will do that. I'll tell them that you've been completely honest with me and that I think that—that you're a real good candidate for rehabilitation which means that—that—you know, that their primary concern should be about your future welfare, making a productive citizen out of you. But for crying out loud, you're going to have to be at least honest with me. How am I going to help you if you don't help me? Okay? Do you believe me?

A: Yeah.

(Emphasis added.)

Later in the interview, Harris asked whether he was going to be charged in relation to his alleged forgery of traveler's checks.

A: Are they charging me with that (indiscernible).

Q: *I don't know.* That's an Anchorage case. I don't know. *You mean the checks? I don't know,* that's an Anchorage case. I don't know on that, Scott. All I'm trying to do is—is to get you to become completely honest and get this whole thing off your chest and out front. Because, you know, the people up in Anchorage are also experts, you know. Those people have been in that business in the big leagues. So the only way out—you're caught, let's just admit that. Okay? *Just—just say, hey, I'm caught that's it.* Because by—by not telling us the truth, or telling us only partial truths, it's only going to look bad on you. *Because, you know, your only hope at this point is to be honest with us* and say, look I'm sorry, you know, it happened. I—you know (indiscernible) it's not going to happen again. And I think that's how you feel about it.

A: (Indiscernible) I cashed the goddam checks, Clark owes me money, I was brainwashed by Bob Mitchell over $14,000. I was broke at the time and I needed some money.

(Emphasis added.)

The following is a summary of the admissions which Harris made to Daugherty:

1. Harris said Bob Mitchell and Rich Farmer stole Garvin's traveler's checks.

2. Harris said that after the burglary he drove Mitchell and Farmer to his apartment and counted the proceeds

from the theft: $14,000 in traveler's checks, two pounds of marijuana and an eighth of an ounce of cocaine.

3. Harris said he assisted Mitchell in falsifying identification in the name of Clark Garvin.

4. Harris would receive a commission for cashing the checks.

5. Harris drove Mitchell around to various banks in Seattle to cash the checks and Mitchell gave Harris some money for helping out.

6. Harris got $3,000 out of the whole deal.

7. Harris signed eighty percent of Garvin's checks.

### Discussion

Harris argues that the statement which he gave in Anchorage should be suppressed because the police did not tape record most of the interview. He argues that the Homer statement should be suppressed because, although the major part of the interview was recorded, the circumstances surrounding the *Miranda* warnings which he was given before that interview were not recorded. Harris urges us to adopt a per se rule of exclusion in those circumstances where a defendant's statement has not been recorded and there are no exigent circumstances which would prevent recording. Harris points to the Alaska cases in which the supreme court has admonished police agencies to tape record any questioning of suspects, including the advisement of and any waiver of constitutional rights, whenever tape recording is feasible.[2] The supreme court said in *McMahan v. State*, 617 P.2d 494, 499 n. 11 (Alaska 1980), *cert. denied*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981):

Again we advise law enforcement agencies that, as part of their duty to preserve evidence, it is incumbent upon them to tape record, where feasible, any questioning and particularly that which occurs in a place of detention. *Mallott v.*

State, 608 P.2d 737, 743 n. 5 (Alaska 1980). Furthermore, as we stated in *In re S.B.*, 614 P.2d 786, 790 n. 9 (Alaska 1980):

It will be a great aid to the trial court's determinations and our own review of the record if an electronic record of the police interview with a defendant is available from which the circumstances of a confession or other waiver of *Miranda* rights may be ascertained.

In addition, if *Miranda* rights are read to the defendant, this too should be recorded.

Harris's argument raises a serious question about how we should enforce the supreme court's requirement that police agencies tape record statements which they take from suspects. There does not appear to be any question that it would have been feasible for the police to tape record Harris's Anchorage statement in its entirety since a tape recorder was used to record the final seven minutes of Harris's confession. The state has not claimed that the tape recorder was unavailable before that time and has not offered any legitimate excuse for the failure to record the statement. It is also clear that all of the Homer statement could have been recorded.

Our dissenting colleague, Judge Singleton, concludes that we should suppress at least Harris's Anchorage statement. Judge Singleton would suppress any statement which was not recorded where it was feasible to record that statement and where the defendant's version of what happened during the statement would, if believed, entitle him to relief. Apparently this rule would apply in a great number of situations, such as where the defendant claimed that he was not given a *Miranda* warning, or claimed that he asked for an attorney, or alleged facts, which, if true, would render his statement involuntary. This rule would certainly put some very sharp teeth in the supreme court's admoni-

---

2. *McMahan v. State*, 617 P.2d 494, 499 n. 11 (Alaska 1980), *cert. denied*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981); *In re S.B. v.*

State, 614 P.2d 786, 790 n. 9 (Alaska 1980); *Mallott v. State*, 608 P.2d 737, 743 n. 5 (Alaska 1980).

tion to the police to tape record statements.[3]

However, the strongest argument against adopting such a rule is that it appears that no other court has done so. Harris has not cited any case in which a court has adopted a rule which would require the suppression of any unrecorded statement. We are not independently aware of any cases which take a position similar to that which Judge Singleton suggests.[4] We think this is highly significant. Trial and appellate courts deal on a daily basis with inculpatory statements which defendants in criminal cases make to police. It is obviously an advantage for a trial judge who is trying to decide what happened during a police interrogation to have a recording of the interrogation. However, it seems apparent that police in this and other states frequently take statements from defendants which are not recorded. It seems clear that trial judges in this state and in other states frequently admit testimony about these statements in trials despite the fact that the defendants have claimed that they were not warned of their

3. We recognize that under the rule which Judge Singleton would adopt, a court would be required to suppress a statement which was not recorded only if the defendant alleged facts which, if true, would entitle him to have his statement suppressed. However, if the police did not record a statement, a defendant has merely to execute an affidavit or testify that he was not warned of his rights, or that he asked for an attorney before he made his statements and suppression would then be required. If we adopted the rule which Judge Singleton suggests, we believe that there is a considerable risk that there would be many allegations along those lines in any case in which the police do not record *Miranda* warnings and the defendant subsequently makes an inculpatory statement.

4. There is support for requiring police agencies to record a defendant's statement in the Uniform Rules of Criminal Procedure and the Model Code of Pre-Arraignment Procedures. However these model rules do not address the question of sanctions. Uniform Rule of Criminal Procedure 243 (1974), states:

Rule 243 [Procedure for Questioning.]

A person who is in custody or otherwise deprived of his freedom of action in any significant way may not be questioned regarding any offense unless preliminary to questioning:

(1) He is warned of each of the matters specified in Rule 212(b) and asked whether he understands each of them; and

(2) Having had reasonable opportunity to exercise his rights, he expressly, voluntarily, knowingly, and intelligently waived each of them and expressly stated that he is willing to answer questions.

If the person in any manner indicates he desires to consult with a lawyer or desires it to stop, questioning shall stop. *The information of rights, any waiver thereof, and any questioning shall be recorded upon a sound recording device whenever feasible and in any case where questioning occurs at a place of detention.* Compliance with Rules 211(b) and 311 may not be delayed for the purpose of questioning.

Unif.R.Crim.Proc. 243, 10 U.L.A. 57 (1974) (emphasis added). The commentary states that this rule "will aid the courts in accurately determining whether there has been compliance with the warning and waiver requirements and to accurately determine the contents of an admission or confession. Sound recordings appear to be the most effective way for the prosecution to meet the 'heavy burden' of demonstrating a knowing and intelligent waiver imposed upon it by *Miranda....*" Unif.R.Crim.Pro. 243, commentary at 57–58.

The American Law Institute's Model Code of Pre-Arraignment Procedure, § 130.4 at 37 (1975), states:

(1) [L]aw enforcement agencies shall make the full ... sound records required by Subsection ... (3) ...

....

(3) *Sound Recordings.* The regulations relating to sound recordings shall establish procedures to provide a sound recording of

(a) the warning to arrested persons pursuant to Subsection 130.1(2);

(b) the warning required by, and any waiver of the right to counsel pursuant to, Section 140.8; and

(c) any questioning of the arrested person and any statement he makes in response thereto.

Such recording shall include an indication of the time of the beginning and ending thereof. The arrested person shall be informed that the sound recording required hereby is being made and the statement so informing him shall be included in the sound recording. The station officer shall be responsible for insuring that such a sound recording is made. Section 130.4(4) states that the recording must be preserved for a reasonable time, and shall be available to the defendant. *Id.* at 38–39. *See also,* Model Code of Pre-Arraignment Procedure § 130.4 note at 39–40, commentary at 345–49 (discussion of the policy basis for, and the practical difficulties of full recording).

rights or that they asked for an attorney. Where so many courts have faced this issue and yet have not excluded these unrecorded statements we believe that a certain amount of judicial restraint is in order.

First, where so many courts are familiar with the problem of conflicts in testimony concerning statements which are unrecorded, and no court has adopted a rule excluding such statements, it is reasonable for us to suspect that there are good reasons for not adopting such a rule. Second, where there are no decisions supporting adoption of such a rule, we can reasonably assume that a decision by this court doing so would come as a significant surprise to the law enforcement agencies and other people who would be affected by such a decision. Although the supreme court advised law enforcement agencies to record statements in *Mallott, In re S.B.*, and *McMahan*, the court never applied any sanctions for the failure of police to record a statement. It is, of course, possible to argue that in those cases the supreme court was announcing a new rule; therefore, it was inappropriate for the court to apply sanctions at that time but it is appropriate for us to apply sanctions now because police agencies have had time to adjust their procedures to conform with the supreme court's admonition. Apparently no court has ever applied a sanction similar to the one which Judge Singleton urges us to adopt. When coupled with the fact that no sanctions were ever applied or threatened in *Mallott, In re S.B.*, or *McMahan*, this indicates that the supreme court did not intend to adopt a rule which would result in frequent exclusion of unrecorded statements.

■ It is possible that the rule which Judge Singleton suggests would be appropriate. However, we believe that the best way to evaluate such a suggestion would be to propose an amendment to the criminal rules. A proposed rule change would allow prosecuting and defense attorneys, judges, police agencies, and other interested parties to comment on the change before implementation. This is in contrast to deciding the issue in a case in which only the state and the defendant are participating. If, after a full discussion of the issues, the supreme court decided to adopt such a change in the criminal rules, the rule could fully explain when a trial court would decide that it was not feasible to record a statement, what factual situations the rule would apply to, and which sanctions would be imposed for violations of the rule. If the rule were adopted, police agencies would know in advance what the rule was going to be and could conform their behavior accordingly. The rule would have a definite effective date and prosecutors could inform police agencies so that it would come as no surprise. We believe that announcing a rule by decision as proposed by Judge Singleton would be a considerable surprise to police agencies in spite of the supreme court's admonitions in *Mallott, In re S.B.*, and *McMahan*. We accordingly do not adopt a general rule which would result in the suppression of unrecorded statements of defendants in those cases where a defendant alleges facts which, if true, would entitle him to have his statement suppressed.

■ On the other hand, the supreme court has clearly stated in three separate cases that the police are under a duty to record statements which suspects make where recording is feasible. That admonition cannot be ignored. However, we believe that the issue of what sanction is appropriate is best approached on a case-by-case basis. The state has the burden of showing that the defendant was given a *Miranda* warning, waived his *Miranda* rights and made a voluntary statement. *See Johnson v. State*, 631 P.2d 508, 509–10 n. 5 (Alaska App.1981). The trial court, and this court in its independent review of the record, can certainly consider the fact that the police had the ability to record the *Miranda* warnings and the defendant's statement in deciding whether the state has met its burden of proof. We believe that in close cases the fact that the police did not record a statement will lead to the suppression of those statements. The failure of the police to record a statement is a

factor which a trial court should consider in deciding whether to suppress a statement. Exactly what sanction, if any, to apply for the failure to record a defendant's statement in a given case is a decision which is best left to the sound discretion of the trial court under the standards set forth in *Putnam v. State*, 629 P.2d 35, 43–44 (Alaska 1980).

In the instant case, Harris pointed out to Judge Carlson language in *McMahan* and the fact that the police had not recorded the *Miranda* warnings which Officer Campbell testified he gave to Harris at the beginning of the Anchorage interview. Harris also pointed out that the police did not record a large portion of the Anchorage interview or the *Miranda* warnings at the beginning of the Homer interview. From Judge Carlson's statements and findings, it seems clear that he considered the fact that the police had not recorded portions of the interviews and found that the police had acted in good faith when they failed to record the interviews. He was aware that the police could have made more extensive recordings and certainly considered that fact, among others, in deciding whether the state met its burden of showing that Harris waived his *Miranda* rights and that his statements were voluntary. Since we do not adopt a per se rule excluding unrecorded statements, we do not require more. The question for our review is whether, considering the fact that Harris's statements were not recorded, there was sufficient evidence to support Judge Carlson's decision.

■ In deciding whether a confession is voluntary, we undertake an independent review of the record. *Troyer v. State*, 614 P.2d 313, 318 (Alaska 1980). The prosecution must prove that the statement is voluntary by a preponderance of the evidence. In determining voluntariness, the court considers the totality of the circumstances. *Quick v. State*, 599 P.2d 712, 718 (Alaska 1979). Harris attacks both the Anchorage and Homer statements arguing that the evidence presented at the suppression hearing shows that he is a young man who is

easily led, that he was inadequately warned of his rights, and that the police made promises and threats which coerced him into making statements. Judge Carlson rejected Harris's contentions, finding that Harris was intelligent and fully functional in English, that he was fully advised of his rights, and that he understood and voluntarily waived his rights. Judge Carlson made specific findings as to threats or promises which had allegedly been made to Harris. He found that the officers asked Harris to be honest with them and that they would report any cooperation to the district attorney; that they informed Harris they could only help him if he "came clean" with them; and that Harris wanted to cooperate with the police in order to get more favorable treatment for himself. Judge Carlson found that Harris was not misled by any offers of help and that his statements to the police were voluntary.

Harris's major point concerning the voluntariness of the confessions turns on the various statements by the officers that they would "help" him. We have reviewed the cases which discuss the effect of similar inducements on a confession or inculpatory statement and conclude that the relevant standard is set forth in *Stobaugh v. State*, 614 P.2d 767, 772 (Alaska 1980), where the court quotes from *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir.1967), *cert. denied* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967):

> The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement was such as to overbear [the defendant's] will to resist and bring about confessions not freely self determined. [Citations omitted.]

■ We conclude that the record supports Judge Carlson's finding that Harris understood that the police were urging him to tell the truth and that if he did cooperate with them by telling the truth they would help him by bringing his cooperation to the attention of the prosecuting authorities. We believe that this sort of inducement is

not improper as long as, under the totality of the circumstances, the defendant's confession is voluntary. *See Quick v. State,* 599 P.2d at 720 n. 12; *United States v. Reynolds,* 532 F.2d 1150, 1156–60 (7th Cir. 1976); *United States v. Ferrara,* 377 F.2d at 17–18; *United States v. Williams,* 447 F.Supp. 631 (D.Del.1978). Having reviewed the record, we conclude that, considering the totality of the circumstances, Harris's confession was voluntary.

## HANDWRITING EXEMPLARS

■ Harris argues that certain handwriting exemplars made following his taped confession in Anchorage should be suppressed as evidence obtained through an illegal search and seizure. However, the record supports Judge Carlson's conclusion that the police informed Harris that he did not have to give a handwriting sample, that the samples would be used for comparison with questioned documents in a criminal prosecution, and that he had the right to talk to a lawyer before giving a handwriting sample. Harris signed a form which contained this information. We conclude that Harris voluntarily gave the handwriting samples to the police, that he was adequately warned of the consequences, and that he was informed of his right to counsel. We find no error. *Cf. Roberts v. State,* 458 P.2d 340, 343 (Alaska 1969) (error found where handwriting exemplar taken without knowing waiver of constitutional right to counsel).

## HEARSAY IN BANK RECORDS

■ Harris contends that the trial court erred in allowing Annie Jones, an officer of Alaska National Bank of the North, to testify as to certain markings on the face of several traveler's checks. Jones testified that the stamp on the face of the traveler's checks indicated that the checks, allegedly forged by Harris, had been cashed at an Anchorage branch of the bank on December 19, 1980. She identified the stamp marks and testified to the normal procedure which led to the stamping. Harris contends that Jones's testimony was hear-

say. Judge Ripley ruled that the testimony concerning the stamp marks was admissible as an exception to the hearsay rule because the stamp mark was a business record. A.R.E. 803(6). We agree that the state established a sufficient foundation to admit this testimony about the stamp mark on the traveler's checks under the business record exception to the hearsay rule.

## JURY INSTRUCTIONS

■ Harris argues that the trial court did not properly instruct the jury on the elements of theft by receiving. Specifically, Harris objects to Instruction No. 8, in which the trial court instructed the jury that in order to find Harris guilty of theft by receiving, they had to find beyond a reasonable doubt each of the following:

(1) That on or about the 11th day of December, 1980, at or near Anchorage, Alaska,

(2) The defendant, Malcolm Scott Harris, did unlawfully buy, receive, retain, conceal or dispose of *stolen property, traveler's checks, the property of Clark Garvin,* having a value of $500 or more,

(3) With reckless disregard that they were stolen.

Harris contends that the instruction was erroneous because it did not clearly inform the jury that in order to convict him they must find that the property in question was stolen. Harris also points out that during deliberations the jury sent Judge Ripley the following note: "Need it be proven that the property was stolen, or need it only be shown that the defendant thought it was stolen?" Judge Ripley merely referred the jury to Instruction No. 8.

The instruction in this case does say that the property must be "stolen property." We believe that a jury would conclude that they must find that the property in question was stolen upon a close reading of Instruction No. 8. Furthermore, Harris's counsel clearly pointed out to the jury in argument that in order to convict Harris they must find that the traveler's checks were stolen from Clark Garvin. The state,

in its argument, also acknowledged this fact. We believe that the better practice would have been to specifically indicate, in response to the jurors' note, that they had to find that the traveler's checks were stolen in order to convict Harris. Nevertheless, we conclude that Instruction No. 8, when coupled with the arguments of counsel, made it clear that the property had to be stolen. We therefore do not find reversible error.

## THE INDICTMENT

Harris challenges the indictment for failing to specify that he must have had an "intent to deprive the owner of property" in order to be guilty of receiving and concealing stolen property. He also charges that the theft by receiving statute, AS 11.46.190,[5] is unconstitutionally vague. We rejected these arguments in *Andrew v. State*, 653 P.2d 1063, 1065–66 (Alaska App. 1982).

The state asks that we modify *Andrew*, arguing that we erred in deciding that a *prima facie* case for receiving, concealing or disposing of stolen property requires proof that the defendant received stolen property "with intent to deprive another of property or to appropriate property of another to himself or a third person." 653 P.2d at 1066–67 (discussing AS 11:46.-100(1)). The state points out that "a person acts intentionally with respect to a result described by a provision of law defining an offense when his conscious objective is to cause that result." AS 11.81.900(a)(1). The state argues that it is impossible to have a conscious objective of depriving an owner of property without knowing that the property was stolen, but AS 11.46.190 specifically establishes "recklessness" as the appropriate *mens rea.*

We addressed these arguments in *Ace v. State*, 672 P.2d 159, 161–62 (Alaska App. 1983), where we said:

We believe the state's position is well taken and that clarification of our holding in *Andrew* is appropriate. Since the theft by receiving statute now provides that a defendant has only to be *reckless* about whether the property involved in the offense is actually stolen, it would be inconsistent to require proof that the defendant also intended to actually deprive a particular owner of the stolen property in question. To avoid inconsistency, the secondary intent requirement for theft by receiving should properly focus on the intent of the accused toward the stolen property, and not on his intent toward the owner of that property. Thus, in addition to establishing that the accused acts with reckless disregard for the fact that property was stolen, the state need only establish, that he intended to appropriate the stolen property to his own use, or to the use of some third party who is not the rightful owner. [Footnote omitted.]

We believe our decision in *Ace* adequately responds to the state's concern.

## SENTENCING ISSUES

Harris next raises several issues concerning his sentencing. Judge Ripley sentenced Harris to five years with two suspended on the theft by receiving conviction and three years, consecutive to the theft sentence, with all three years suspended, for the forgery conviction. The aggregate sentence was eight years with five suspended. Judge Ripley also placed Harris on probation for five years and ordered restitution in the amount of $7,000.

■ Harris first contends that he should not have been sentenced for both theft by receiving and forgery. He claims that these offenses constitute essentially the same offense, citing *Whitton v. State*, 479 P.2d 302, 312 (Alaska 1970). We con-

---

**5.** AS 11.46.190 provides:
*Theft by receiving.* (a) A person commits theft by receiving if he buys, receives, retains, conceals, or disposes of stolen property with reckless disregard that the property was stolen.

(b) As used in this section, "receives" includes acquiring possession, control, or title, or lending on the security of the property.

clude that the offense of receiving the stolen traveler's checks and the offense of forging those same traveler's checks can be separated for purposes of sentencing into two distinct crimes involving different societal interests. The theft statute protects society's interest in preserving ownership in tangible property. Forgery, on the other hand, serves the societal interest of preserving the integrity of negotiable instruments. We note that while the theft injured Garvin, the owner of the traveler's checks, the forgery and negotiation of the checks injured an expanded set of victims including the financial organizations negotiating the checks.

 Harris next contends that he was unfairly denied the right to cross-examine the author of the presentence report. Although we believe that a defendant, in appropriate circumstances, does have the right to examine the author of the presentence report,[6] having reviewed the record we conclude that all of the questions which Harris wanted to raise were adequately answered by the trial court making it unnecessary for the author of the presentence report testify. We find no error.

 Harris next objects to the fact that the sentencing court considered reports from psychiatrist Aaron Wolf and a social worker, Mr. Sparrow. Sparrow worked at the same clinic as Dr. Wolf and prepared a report for Dr. Wolf's use before his examination of Harris. The reports were prepared under court order at the request of the defense. Harris contends they were therefore limited solely to his use. Harris objected before sentencing to any use of these reports. He argues that he has a right to have a confidential psychiatric report prepared for use in his defense which is not discoverable by the court or prosecution. Dr. Wolf testified at the omnibus hearing as a witness for Harris. Before that hearing copies of the reports had arrived in the court files. Harris also submitted an affidavit from Dr. Wolf which he wished to have Judge Ripley consider at sentencing. Under these circumstances,

we conclude that Harris waived any privilege which he had to keep the reports of Dr. Wolf and Mr. Sparrow confidential. A.R.E. 510. *See Houston v. State*, 602 P.2d 784, 789–92 (Alaska 1979) *modified on other grounds*, 648 P.2d 1024 (Alaska App. 1982).

 Harris argues that the trial court erred in requiring him to make restitution in the amount of $7,000. He reasons that the jury which convicted him need only have found that he stole property having a value of $500, the jurisdictional amount for the statute under which he was convicted, and that he forged one check. Harris argues that the legislature limits restitution to "actual damages or loss caused by the crime for which the conviction was had." AS 12.55.100(2); *Schwing v. State*, 633 P.2d 311, 313 (Alaska App.1981). Harris does not contend that there was insufficient evidence to support the amount of restitution that the trial court ordered. In *Fee v. State*, 656 P.2d 1202, 1205–06 (Alaska App.1982), we required the trial court to limit the restitutionary award to the specific crime for which the defendant was convicted. We concluded, nevertheless, that the trial court was free to determine the actual loss resulting from that crime, independent of the jury verdict, so long as the trial court's award was based upon substantial evidence. In this case the evidence established that all of the stolen traveler's checks resulted from a single theft and that Harris exercised dominion over all of the checks. The trial court did not err in concluding that Harris's theft by receiving conviction involved all of the traveler's checks. The trial court did not err, therefore, in requiring Harris to pay $7,000 restitution.

 Harris claims that his sentence was excessive. The record reflects that Harris has several juvenile offenses, numerous traffic offenses, and several adult misdemeanor convictions. We believe that this record of offenses, coupled with the

6. *See Mangold v. State,* 613 P.2d 272, 276 (Alaska 1980).

serious nature of the current offense, justify the sentence imposed.

The conviction and sentences are AFFIRMED.

SINGLETON, Judge, concurring and dissenting.

I agree with the majority's resolution of most of the issues in this case. I disagree, however, with the treatment given to both Harris's contention that his statement to the Anchorage Police should have been suppressed and his contention that the trial court unduly restricted his right to cross-examine the author of his presentence report.

## THE ANCHORAGE STATEMENT

Harris argues that the statement which he gave in Anchorage should be suppressed because the police did not tape-record most of the interview. He contends that as a result he was handicapped in convincing the trial court that his version of the events, rather than the investigating officer's version, was true. Consequently, he contends the trial court should have suppressed his Anchorage statement. He relies on *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215, 218 (1963), *Anchorage v. Serrano,* 649 P.2d 256, 259 (Alaska App.1982), and *Lauderdale v. State,* 548 P.2d 376, 381 (Alaska 1976). *See also United States v. Valenzuela-Bernal,* 458 U.S. 858, 872, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193, 1205 (1982); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Williams v. State,* 629 P.2d 54, 64 (Alaska 1981); *Wyrick v. State,* 590 P.2d 46 (Alaska 1979); *White v. State,* 577 P.2d 1056, 1059 (Alaska 1978); *Torres v. State,* 519 P.2d 788, 795 (Alaska 1974).

The cited cases discuss the prosecution's dual responsibility to (1) preserve evidence favorable to the accused that it has acquired in the course of its investigation, and (2) to turn that evidence over to the defendant for use in his defense. We have recognized, in addition, that the due process clause, under certain circumstances, may require the prosecution to obtain evidence for use by the defendant that it would not ordinarily have sought on its own behalf. In *Anchorage v. Serrano,* we said:

> The state and municipality have pointed out that while *Lauderdale* involved the preservation of evidence already in existence, the instant case poses a situation in which the evidence must first be gathered prior to preservation. We do not believe that *Lauderdale* can be restricted to merely require the state to preserve existing evidence. It appears to us that there are instances when due process can require additional testing or investigation, such as where the additional evidence so obtained is of sufficient materiality and where the cost and effort involved in obtaining it are reasonable. *See Mallott v. State,* 608 P.2d 737, 743 n. 5 (Alaska 1980) (law enforcement agencies advised that as part of their duty to preserve evidence it is incumbent upon them to tape record questioning of the defendant where feasible).

649 P.2d at 258–59 (footnote omitted).

In a recent decision, *State v. Contreras,* 674 P.2d 792, 821 (Alaska App.1983), we summarized the holdings of the federal and Alaska cases requiring the prosecution to preserve evidence as follows:

> Alaska cases discussing the prosecution's failure to preserve evidence require a finding that the evidence would have affected the outcome before a sanction, including suppression of evidence, is warranted. Where a specific rule or court decision requires preservation of certain evidence, and the defendant makes a timely request for that evidence but it is missing, prejudice to the defendant will be presumed unless the state sustains the burden of proving that it acted in good faith and that the evidence, if preserved, would not have helped the defendant. If, after considering the whole record, the court is in doubt regarding prejudice to the defendant or the prosecution's good faith, then a sanction is warranted. *See Putnam v. State,* 629

P.2d 35, 44 n. 18 (Alaska 1980). Where no specific rule or court decision requires the prosecution to preserve the evidence in question, however, the defendant bears the burden of proving that, if preserved, the evidence would have been exculpatory, *see* Alaska R.Crim.P. 16(b)(3), and that the prosecution should have recognized that it might be exculpatory and preserved it. *See Nicholson v. State*, 570 P.2d 1058, 1064 (Alaska 1977). Similarly, where there is no timely request for the evidence, the defendant must establish the materiality of the missing evidence. *See Maloney v. State*, 667 P.2d 1258, 1263–67 (Alaska App. 1983); *Carman v. State*, 658 P.2d 131, 139–40 (Alaska App.1983).

It is undisputed that Harris made a timely request for a transcript of the recording of the entire Anchorage interrogation. It appears that the state controlled the decision whether to record the interrogation and Harris had no comparable opportunity to keep a record of what was said. It appears equally undisputed that a specific rule derived from case law required the Anchorage police to record its interview with Harris. The supreme court first announced this rule in *Mallott v. State*, 608 P.2d 737, 743 n. 5 (Alaska 1980), where the court said:

> At trial, Mallott did not testify that the outburst [an angry and humiliating outburst against him during interrogation by a trooper who was not conducting the interrogation] preceded his statements. His claim on appeal is solely the result of a misreading of the trooper's trial testimony. It is appropriate at this time however, to advise law enforcement agencies that as part of their duty to preserve evidence, *see Catlett v. State*, 585 P.2d 553, 558 n. 5 (Alaska 1978), it is incumbent upon them to tape record, where feasible, any questioning and particularly that which occurs in a place of detention. *See* Uniform Rule of Criminal Procedure, Rule 243 (10 U.L.A. 57) (1974).

As we recognized in *Serrano*, the duty described in *Mallott* was squarely predicated on the due process clause of the United States Constitution. 649 P.2d at 259. The *Mallott* decision clearly adopted Uniform Rule of Criminal Procedure 243, and directed police agencies to comply with it. Uniform Rule of Criminal Procedure 243, which is set out verbatim in the majority opinion, unambiguously provides:

> A person who is in custody or otherwise deprived of his freedom of action in any significant way may not be questioned regarding any offense unless preliminary to questioning:
>
> (1) He is warned of each of the matters specified in Rule 212(b) and asked whether he understands each of them; and
>
> (2) Having had reasonable opportunity to exercise his rights, he expressly, voluntarily, knowingly, and intelligently waived each of them and expressly stated that he is willing to answer questions.
>
> If the person in any manner indicates he desires to consult with a lawyer or desires it to stop, questioning shall stop. *The information of rights, any waiver thereof, and any questioning shall be recorded upon a sound recording device whenever feasible and in any case where questioning occurs at a place of detention.* Compliance with Rules 211(b) and 311 may not be delayed for the purpose of questioning.

Unif.R.Crim.Pro. 243, 10 U.L.A. 57 (1974) (emphasis added).

As the majority notes, the commentary states:

> This [rule] will aid the courts in accurately determining whether there has been compliance with the warning and waiver requirements and to accurately determine the contents of an admission or confession. Sound recordings appear to be the most effective way for the prosecution to meet the "heavy burden" of demonstrating a knowing and intelligent waiver imposed upon it by *Miranda* ....

Unif.R.Crim.Pro. 243 commentary at 57–58. *Accord* Model Code of Pre-Arraignment Procedure § 130.4(3) at 38 (1975).

It is undisputed, and the majority concedes, that it was feasible to record the entire interview with Harris. However, testimony at Harris's suppression hearing established that the Anchorage police have adopted a policy, contrary to this rule, of only recording actual confessions. Although the police had sound equipment readily available, they only recorded Harris's ultimate confession. While Judge Carlson chose his words very carefully, it is clear that he joined in the police department's intentional rejection of the rule adopted by the supreme court. Essentially, he concluded that the rule was a bad rule and should not be followed. Surprisingly, the majority affirms this conclusion. The majority's reasoning apparently rests on three assumptions: first, that the supreme court really did not mean what it said; second, that decisions of the Alaska Supreme Court should only be followed by the lower courts when they are supported by case law from at least one other jurisdiction; and third, that enforcement of the rule would deprive the police of a number of accurate confessions.

I cannot see how it can be argued that the supreme court did not mean what it said in *Mallott*. The court has repeated its admonition in two subsequent cases: *McMahan v. State,* 617 P.2d 494 (Alaska 1980), *cert. denied,* 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981), and *In re S.B.,* 614 P.2d 786 (Alaska 1980). In *McMahan* the court said:

> Again we advise law enforcement agencies that, as part of their duty to preserve evidence, it is incumbent upon them to tape record, where feasible, any questioning and particularly that which occurs in a place of detention. *Mallott v. State,* 608 P.2d 737, 743 n. 5 (Alaska 1980). Furthermore, as we stated in *In re S.B.,* 614 P.2d 786, 790 n. 9 (Alaska 1980):
>
> > It will be a great aid to the trial courts' determinations and our own review of the record if
> > an electronic record of the police interview with a defendant is available from which the circumstances

of a confession or other waiver of *Miranda* rights may be ascertained.

> > In addition, if *Miranda* rights are read to the defendant, this too should be recorded.

617 P.2d at 499 n. 11.

Equally untenable is the majority's suggestion that the rule should not be enforced because no other court has embraced it. Essentially, this reiterates the unacceptable position that the rule is a bad rule and should not have been adopted in the first place. I disagree. Professor Kamisar has set out the arguments in favor of the rule at length in his article: Kamisar, *Forward: Brewer v. Williams—A Hard Look at a Discomfitting Record,* 66 Geo. L.J. 209 (1977). It is unnecessary to quote these reasons at length. His conclusion however bears repetition:

> It is not because a police officer is more dishonest than the rest of us that we should demand an objective recordation of the critical events. Rather, it is because we are entitled to assume that he is no less human—no less inclined to reconstruct and interpret past events in a light most favorable to himself—that we should not permit him to be "a judge of his own cause."

Kamisar at 242–43 (footnote omitted). *See also* Williams, *The Authentication of Statements to the Police,* Crim.L.Rev., Jan. 1979 at 6; Model Code of Pre-Arraignment Procedure § 130.4 commentary at 341–50 (1975).

Even if the *Mallott* rule was ill-conceived, we would still be obligated to follow it. *People v. Rincon-Pineda,* 14 Cal.3d 864, 123 Cal.Rptr. 119, 538 P.2d 247, 252–53 (1975); *Auto Equity Sales, Inc. v. Superior Court,* 57 Cal.2d 450, 20 Cal.Rptr. 321, 369 P.2d 937, 939–40 (1962) (lower court exceeds its jurisdiction when it refuses to follow decision of higher court on ground that the decision is erroneous).

Of course, it would be unfortunate for police and prosecutors to be deprived of the use of accurate confessions. Even so, the principles barring retroactive application of

court decisions should not stand in the way of the enforcement of the *Mallott* rule in this case. *See United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982); *State v. Glass,* 596 P.2d 10 (Alaska 1979). *Mallott,* after all, was decided on February 22, 1980, almost one year before Harris was interrogated in Anchorage. It cannot be persuasively argued that the police were reasonably ignorant of the *Mallott* decision.

The police offered two justifications for not recording their interview with Harris. First, they contended that following the *Mallott* rule would require wasting cassettes since it is never clear when interviewing a witness that he will confess. I do not think this argument requires rebuttal. *See* Model Code of Pre-Arraignment Procedure § 130.4 commentary at 342–43. The primary reason for failing to record is the fear of the police that recording an interview with a criminal suspect will frighten the suspect and chill any willingness he might have to confess. This argument rests on the assumption that a criminal suspect in custody must be told that his comments are being recorded. There is no such requirement.[1] As Professor Kamisar notes, "[c]ourts which have considered the question have held that secret recording of police interrogation does not, in itself, affect the admissibility of statements." Kamisar, at 237 n. 122, *quoting* Model Code of Pre-Arraignment Procedure § 130.4(2) commentary at 349. He continues:

> The Model Code does provide that an arrestee be informed that a sound recording is being made, but recognizes that this requirement "raises a difficult question" [commentary] at 348. Such a requirement does minimize the possibility that an arrestee will be misled about the seriousness of his situation, but knowledge that they are being recorded may make many reluctant to speak, even those who would not be inhibited by the knowledge that what they were saying was being reduced to writing, (although

it could lead *some* to talk more freely, secure in the knowledge that they would not be misquoted).

> Informing the arrestee that what he may say will be recorded is probably preferable, but I do not feel strongly about it. The important thing is that wherever feasible all conversation between the police and a person in custody be tape recorded, whether or not the person is informed that this is taking place. If the price for a system requiring sound recordings of the warnings, any waivers or other responses, and any subsequent conversation is that the suspect need not be told that a sound recording is being made, I would be quite willing to pay it.

Kamisar, at 237–38 n. 122 (citation omitted). Whatever the rule in most jurisdictions, our supreme court has squarely held that there is no duty to tell someone in custody that his statements or movements are being recorded. *Palmer v. State,* 604 P.2d 1106, 1108 (Alaska 1979). *Accord People v. Crowson,* 33 Cal.3d 623, 190 Cal. Rptr. 165, 660 P.2d 389, 392 (1983). Our decision in *Quinto v. Juneau,* 664 P.2d 630, 635–36 (Alaska App.1983), *petition for hearing granted,* August 8, 1983, is not to the contrary. There we held that the warrant requirement of *State v. Glass,* 583 P.2d 872 (Alaska 1978), must be read to include situations involving routine, nonconsensual recording of pre-arrest conversations between citizens and uniformed officers. 664 P.2d at 636. It is clear in context that the *Quinto* rule only applies to those who are not "in custody" and therefore not entitled to *Miranda* warnings. *See O'Neill v. State,* 675 P.2d 1288, 1290–1291 (Alaska App.1984) (*Quinto* does not apply when recording is commenced at the time of a lawful stop or arrest). It is equally clear that Harris and those similarly situated are in custody and therefore outside the protections of *Quinto.*

---

1. There is such a requirement in the Model Code of Pre-Arraignment Procedure § 130.4(3)

at 38 (1975).

In summary, the Alaska Supreme Court in *Mallott* adopted Uniform Rule of Criminal Procedure 243 as a rule of decision in this state, based upon an interpretation of the due process clause of the state and federal constitutions. Since the police violated that rule in this case, and I believe the majority concedes as much, the rule of *Putnam v. State*, 629 P.2d 35, 43–44 (Alaska 1980), comes into play:

The state's failure to comply with these disclosure requirements, due to its loss or destruction of the evidence in question, does not automatically trigger the imposition of sanctions. Rather, the trial court must carefully examine the circumstances surrounding the state's violation of its duty of preservation. What, if any, sanctions are appropriate is to be determined by weighing the degree of culpability involved on the part of the state, the importance of the evidence which has been lost, and the evidence of guilt which is adduced at trial. Where the evidence in question was destroyed in bad faith or as part of a deliberate attempt to avoid production, sanctions will normally follow. On the other hand, where it appears that the evidence was lost or destroyed in good faith, the imposition of sanctions will depend upon the degree to which the defendant has been prejudiced. In cases where the defendant cannot reasonably be said to have been prejudiced by the state's good faith failure to preserve the evidence, sanctions will generally not be appropriate. Where, however, the defendant has suffered prejudice, sanctions will generally be warranted. Just what sanction is appropriate in a given case is best left to the sound discretion of the trial court. [Citations omitted; footnotes omitted.]

Thus the proper course to follow depends upon a determination of the state's good faith,[2] and the materiality of the evidence lost. In commenting upon this decision making process, the supreme court added:

In applying this rule, the heavy burdens of establishing that the failure to preserve the evidence occurred in good faith and not out of a desire to suppress evidence and of demonstrating that the defendant has suffered no resulting prejudice rests squarely on the shoulders of the state. Moreover, the difficulties involved in speculating whether or not the lost or destroyed materials could have been utilized effectively at trial mandate that the harmless error doctrine be strictly applied in these cases.

*Id.* at 44 n. 18 (citations omitted).

In essence, the supreme court in *Putnam* required trial courts to fashion a "remedy" for the loss of evidence. It is unfortunate that the court used the term "sanction," in place of the term "remedy," for as the court pointed out in *Williams v. State*, "the purpose of the duty of preservation is not to punish the police but to insure a fair trial for the accused." 629 P.2d 54, 64 n. 22 (Alaska 1981), *quoting State v. Wright*, 87 Wash.2d 783, 557 P.2d 1, 7 (1976). *See also Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215, 218 (1963).

The remedy should serve two purposes. The first is corrective. It should attempt to place the defendant in the same position

**2.** The Supreme Court explains the significance of police "good faith" as follows:

The state argues that due process was not violated because the erasure was done in good faith. An officer's good faith, however, does not justify destruction of material evidence. *See White v. State*, 577 P.2d [1056,] 1060 n. 14 [(Alaska 1978)]; *Lauderdale v. State*, 548 P.2d 376, 381–82 (Alaska 1976). *See also Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972); *State v. Wright*, 87 Wash.2d 783, 557 P.2d 1, 4, 7 (1976). The reason is that the "purpose of the duty of preservation is not to punish the police but to insure a fair trial for the accused." *Wright*, 557 P.2d at 7, *citing Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215, 218 (1963). The motive for destruction is relevant only when the absence of a good faith explanation raises the inference that the evidence would have been detrimental to the prosecution, thus establishing materiality of the evidence. *See People v. Hitch*, 12 Cal.3d 641, 117 Cal.Rptr. 9, 18 n. 7, 527 P.2d 361, 370 n. 7 (1974); *State v. Wright*, 557 P.2d at 6–7.
*Williams v. State*, 629 P.2d 54, 64 n. 22 (Alaska 1981).

he or she would have been in had the evidence been preserved and turned over in time for use at trial. The second purpose is preventative. It should deprive the state of any advantage gained by the failure to preserve the evidence, thus encouraging compliance with the rule in the future. It appears to me that the only reasonable remedy likely to serve these two goals is suppression of the confession in cases in which the defendant testifies to facts which, if true, would invalidate the confession, and the police officer's contradictory testimony is uncorroborated.[3] Essentially, Harris challenged his confession not on the ground that it was untrue, but on the ground that it was obtained in an unconstitutional manner. In order to sustain this claim, he sought to show: first, that *Miranda* warnings were not properly and timely given; and second, that the requirements of *Miranda*, that interrogation cease if the defendant expresses an unwillingness to be interrogated or requests an attorney, were not complied with. Alternatively, he wished to show that his confessions were the product of unconstitutional inducements and were therefore involuntary. Such claims invariably produce a swearing contest in which defendants claim that they were not afforded their constitutional rights and the police officers claim that they were. Since defendants are interrogated in custody, isolated from anyone other than police officers, they cannot provide independent corroboration of their own testimony regarding what occurred during the interrogation. In a sense then, a tape recording provides an objective means for evaluating what occurred during interrogation. It also provides the defendant with a means of "cross-examining" his confession in the sense that the *Lauderdale* court referred to cross-examining breathalyzers, *i.e.*, testing the accuracy of what occurred during the interrogation by

independent evidence. *See* 548 P.2d at 381. The importance of such a tape recording lies in the fact that trial courts and appellate courts tend to trust police officers' recollections of what occurred at the expense of the criminal defendant's account. Thus, in the absence of a tape recording, the prosecuting authorities invariably win the swearing contest. The heavy burden of proving compliance established by *Miranda* becomes, in practice, no burden at all. The majority ignores this result of the absence of a tape recording and apparently concludes that an admonition to the trial courts to consider the absence of a tape recording in evaluating the credibility of prosecution witnesses will suffice to protect the defendant's due process rights. Such a "remedy" clearly does not serve the corrective function of placing the defendant in the position he would have been in had the evidence been preserved. Nor does it serve the preventative function since, as this case and its companions demonstrate, despite the admonition, trial courts will continue to resolve conflicts in favor of the prosecuting authorities. It is instructive that the court does not remand this case to the trial court for reconsideration in light of its conclusion that the police officer's testimony should have been viewed with distrust. The officer's testimony was not corroborated and it is clear Judge Carlson did not view the officer's testimony with distrust.

### DENIAL OF CONFRONTATION

Harris contends that he was denied the right to cross-examine the author of the presentence report. The record bears this out. Judge Ripley clearly informed counsel that no cross-examination would be permitted. It is important in this context to recognize that the presentence officer did more than simply summarize information

---

3. *Cf.* Model Code of Pre-Arraignment Procedure § 150.3(5) (the state is required to prove compliance with *Miranda* by clear and convincing evidence where no recording is made).

The Model Code also "directs the court to give weight to the defendant's account in any factual dispute if it finds that the police department has

not set up procedures [full written records and sound recordings] to insure compliance with the Code or has not diligently and in good faith sought to comply with the recordkeeping provisions." Model Code of Pre-Arraignment Procedure § 130.4 commentary at 343.

received from others. The probation officer offered an expert opinion that Harris could not be effectively deterred or rehabilitated by a non-incarcerative sentence. Under the circumstances, I believe Harris should be entitled to a new sentencing at which he is given the opportunity to cross-examine the presentence officer regarding the basis for this opinion. *See Mangold v. State*, 613 P.2d 272, 276 (Alaska 1980). While some cursory treatment was given at the hearing to Harris's expressed concerns about the presentence report, I believe that it was inadequate under the circumstances to establish harmless error. In *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624, 628 (1931), the United States Supreme Court said:

> It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial. [Citations omitted.]

The Alaska Supreme Court quoted this language with approval in *Lauderdale v. State*, 548 P.2d at 381, and analogized the right to test the reliability of a breathalyzer machine by a scientific analysis of the ampoules to the right to cross-examination. Relying on *Alford*, the court held: "[a] denial of the right to make such analysis, that is to say, to 'cross-examine' the results of the test, would be reversible error without any need for a showing of prejudice." *Id.* at 381, *citing R.L.R. v. State*, 487 P.2d 27, 44 (Alaska 1971).

The presentence officer plays a significant part in the sentencing process. Frequently, the only insight the trial court has into the underlying facts of the offense and the offender's capacity for rehabilitation comes from the presentence report. While the trial court has substantial discretion in controlling the proceedings, I would hold that Judge Ripley committed prejudicial error in refusing to allow Harris reasonable opportunity to cross-examine the presentence officer regarding the opinions that the officer expressed in the presentence report.