William E. PLANT, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. 7734/A–37.

Court of Appeals of Alaska.

Sept. 5, 1986.

Kevin F. McCoy, Asst. Public Defender, Kenai, and Dana Fabe, Public Defender, Anchorage, for appellant.

W.H. Hawley, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

William E. Plant, Jr., was convicted in the superior court of four counts of burglary in the second degree,[1] and in the district court of criminal mischief in the third degree (joyriding).[2] His convictions were based on a confession he made while in police custody.

Prior to trial, Plant sought suppression of his confession, arguing that it had been involuntarily given in derogation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The superior court found that Plant's confession was voluntary.[3] We initially reversed, having concluded that, based on the record on appeal, the state had not met its heavy burden in showing that Plant knowingly and intentionally relinquished his right to counsel. We granted the state's petition for rehearing, withdrew our opinion, and remanded the case to the superior court for additional factual findings. We now affirm the denial of suppression, having determined that Plant made a valid waiver of counsel and that his confession was voluntary under a totality of the circumstances. We also hold that the court

1. AS 11.46.310(a).

2. AS 11.46.484(a)(2).

3. On the criminal mischief charge, the district court adopted the finding of the superior court that the confession was voluntary.

properly refused to dismiss the indictment and, finally, that the sentence imposed in the misdemeanor case was not excessive.

## I.

In seeking the suppression of his confession, Plant first argues that his statements were involuntary because they were obtained in derogation of a statutory right to counsel under AS 18.85.110. That statute provides in pertinent part:

(a) If a person having a right to representation under AS 18.85.100 is not represented by an attorney, the law enforcement officers concerned, upon commencement of detention, or the agency, or the court, as the case may be, shall

(1) clearly inform him of the right of an indigent person to be represented by an attorney at public expense; and

(2) if the person detained or charged does not have an attorney, notify the agency or the court, as appropriate, that he is not so represented.

Plant contends that, since the Homer Police Department had failed to make any attempt to notify the Public Defender Agency of his arrest, the court should have found that the police had violated AS 18.-85.110(a)(2).

The facts surrounding Plant's arrest and confession are as follows. In the fall of 1982, there was a string of burglaries in Homer. On November 4, at approximately 7:00 a.m., Plant was arrested for joyriding in a vehicle which had been linked to a burglary of the Marquis Furniture Store on the previous evening. Plant was taken to the police station, where he was read his rights and was briefly questioned by the police chief, Michael Daugherty. Plant testified that Chief Daugherty told Plant he "was in a lot of trouble" and advised him that if he "started talking ... they wouldn't handle me so hard...." However, Plant invoked his right to remain silent and was placed in a cell.

Plant was arraigned at 4:00 that afternoon on both the joyriding and burglary charges. During the arraignment, District Court Judge James Hornaday asked Plant if Plant wanted representation by the Public Defender Agency. Plant told the court that he preferred to be represented by Martin Friedman, a lawyer in private practice in Homer. Homer Police Officer Michael Eastham was present in court during this exchange. After Plant was returned to the police station, Officer Dennis Oakland twice attempted to reach Friedman by telephone but learned that he was in Anchorage. Officer Oakland advised Plant that Friedman was unavailable and asked Plant if he wanted to contact someone else. Plant told Officer Oakland that Lori Woods, a friend of Plant's, would help him obtain representation.

On the following day, November 5, at 2:30 p.m., Plant indicated that he wanted to talk to the police. After Plant was read *Miranda* warnings, the following exchange occurred:

OAKLAND: ... Do you understand these rights Bill?

PLANT: Yes, I do.

OAKLAND: Do you have any questions in reference to your rights?

PLANT: Reference to what?

OAKLAND: Any questions in,..... Okay.

PLANT: No, no.

DAUGHERTY: I have a question to ask you. Do you know what lawyers do?

PLANT: Yea, but I can't seem to get a hold of one, so....

DAUGHERTY: Do you know what they do?

PLANT: Yeah I know. They stick up for me I guess, that's about it.

DAUGHERTY: Do you realize lawyers represent you?

PLANT: Yes, I do.

DAUGHERTY: Do you realize they are more trained in the law than what you are? They know more about it?

PLANT: Yes, I do.

OAKLAND: Do you realize that you are eligible for a public defender Billy?

PLANT: Yes, I do.

OAKLAND: Okay you called me into your cell a few minutes ago and told me

basically that you wanted to get straight. Yesterday you told us that you didn't want to make any statements. Are you changing your mind on that now?

PLANT: Yes, I am.

OAKLAND: Okay, you also requested an attorney yesterday, of your own free will, are you changing your mind? You don't want to have an attorney?

PLANT: No, I don't want an attorney now. I just want to get this over with.

OAKLAND: Okay, Billy reinterating [sic] Chief Daugherty, you do understand that you are entitled to have an attorney. If you cannot find one a public defender will be appointed for you, is that correct?

PLANT: Yes.

OAKLAND: Okay, Billy. Also, has any threats or promises or coercion been used by myself or anyone in the police station to entice you to answer any questions?

PLANT: No, there hasn't.

Plant then admitted to committing seven burglaries, including the one with which he had been charged.

■ On these facts, it seems clear that the Homer police did not violate the mandate of AS 18.85.110. The police informed Plant of his right to have an attorney appointed for him at public expense, but Plant nevertheless indicated his intention to consult with a private attorney, named that attorney, and expressly declined the police

4. Plant testified:
A  I asked Chief Daugherty if—if he would, you know, find me a public defender, and he referred Yoshida, you know, and he called him from his office—wherever it was ...
Q  Uh-huh.
A  ... and he said Yoshida didn't want to talk to me.
Q  Did he tell anything about his conversation with Yoshida?
A  No, he did not. He just said Yoshida did not want to talk to me. He did not ...
Q  And for the record Steve Yoshida is an attorney down in Homer?
A  Yes, he is. He's a public defender.
....
Q  When did you talk with Chief Daugherty about getting Yoshida?
A  That was—that was probably in the morning. I don't recollect the time.
Q  Morning of what day?

offer to contact other counsel when it was learned that Friedman was not immediately available. Under such circumstances, the Homer police were not required to notify the Public Defender Agency of Plant's detention.

■ However, the record, which was originally certified on appeal, also reflected that, at some point during his detention, Plant asked Chief Daugherty to contact Steve Yoshida, another Homer attorney whom Plant mistakenly believed was a public defender, and that Daugherty had told Plant that Yoshida refused to speak with him.[4] Furthermore, Plant's statement that he "can't seem to get a hold of one," made prior to the confession, suggested that Plant had been frustrated in his efforts to obtain an attorney and that he may not have knowingly and intelligently relinquished the right to consult with counsel prior to questioning. *See Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 721 (1966). We remanded so that the superior court could make additional findings that would allow us to determine whether Plant's requests for counsel were in fact scrupulously honored and his subsequent waiver of counsel was valid.

■ On remand, Superior Court Judge Charles K. Cranston, who presided over the evidentiary hearing on Plant's motion to suppress, determined that:

A  It could have been Friday or Saturday.
Q  Well, was it the day you confessed?
A  Yes, it could have been. I don't recollect. I asked for Yoshida. It was about two days after I, you know, I found out it was a lost cause in finding Marty 'cause my brother—must have been ...
Q  Did you ask Yoshida before or after you confessed?
A  Asked before.
Q  Before you confessed?
A  Yes, I did.
Q  And who did you ask to get you Yoshida?
A  Chief Daugherty.
Q  When to the best of your recollection was that? Was that before or after your father visited?
A  That was before.
Q  So this all took place—this was just one meeting that morning then?
A  Yes.

Plant did not raise the matter of the Public Defender or Steve Yoshida during his discussions with Daugherty during the 11:45 November 5, 1982 contact. He raised the issue, if at all, possibly one day later. Plant's testimony throughout the record of this hearing and the arraignment is inconsistent. For example, Plant also testified that he asked about Yoshida about two days after he found out that he could not contact Marty Friedman. But, as late as 4:00 [p.m. on] November 4, 1982, Plant believed Friedman was his attorney. In addition, Plant has been inconsistent or has misrepresented other facts throughout his testimony. He testified that this conversation with Daugherty took place before his father visited him, a fact clearly disproved by the jail log. Lastly, immediately following the 11:45 a.m. contact, Daugherty wrote a summary of the contact, and that summary includes no reference to Yoshida.

We conclude that these findings are not clearly erroneous and that Plant's earlier request that counsel be contacted was fully honored by the Homer police.[5]

■ As we have indicated in *Sheakley v. State*, 644 P.2d 864, 869 (Alaska App. 1982), a defendant who has invoked his right to remain silent and who has requested counsel, may still waive his fifth amendment right to obtain counsel or have counsel present during interrogation. *See also Oregon v. Bradshaw*, 462 U.S. 1039, 1044–45, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405,

411 (1983) (an accused, who has previously indicated that he would only deal with police through counsel, may subsequently waive that *Miranda* right). Based upon a totality of the circumstances, we find that Plant made a valid waiver of his right to counsel prior to giving his statement to the police.

■ In addition to arguing that the waiver of counsel was ineffective, Plant contends that his will was overborne by promises of leniency from Chief Daugherty and Plant's father and that his confession was therefore involuntary. After Plant was arraigned on November 4, Plant's father spoke with Officer Oakland, who told Plant's father that Plant had been arrested for the burglary of the Marquis and that "there was a strong case against him." Officer Oakland additionally told Plant's father that Plant was also suspected of having committed other burglaries.

The next morning, Plant's father visited the jail. Plant's father first spoke with Officer Eastham. Officer Eastham's version of the conversation was that "Mr. Plant told me that he was going tell his son to confess and get it over with, and I told him that that would be a good idea to get it all off his chest at once." Plant's father testified that Officer Eastham stated that Plant could be linked to six or eight burglaries, but if Plant cooperated with the police, Plant might be charged with only four burglaries. Plant's father in turn, related his version of this conversation to Plant. Plant asked to talk to Chief Daugherty at

---

**5.** In determining whether Plant's waiver of his earlier request for counsel was constitutionally effective and, consequently, whether his statements could be admitted against him, the trial court also had to have found, as a preliminary matter, that Plant had initiated the discussions with the police leading to his confession. *Smith v. Illinois*, 469 U.S. 91, ——, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488, 493–94 (1984); *Edwards v. Arizona*, 451 U.S. 477, 485–86 n. 9, 101 S.Ct. 1880, 1885 n. 9, 68 L.Ed.2d 378, 387 n. 9 (1981).

On remand, Judge Cranston found that Plant had initiated the contact with the police, after having previously invoked the right to remain silent and after having expressed his intention to be represented by an attorney. Judge Cranston disbelieved Plant's assertion that Chief

Daugherty had come to his cell uninvited. Rather, the court found that, shortly after Plant's father had visited the jail on November 5, Plant had asked Officer Eastham if he could speak to Chief Daugherty. At approximately 11:45 a.m., Plant told Daugherty that he knew the names of people who had been involved in burglaries in Homer. When Daugherty told Plant he was in trouble himself for the Marquis burglary, Plant told Daugherty that he would admit to taking a truck but would admit to nothing else. At that point, the conversation ended. At 2:30 p.m., Plant again initiated contact, this time with Officer Oakland. He told the police he was ready to talk. Upon review of the record, we conclude that these findings were not clearly erroneous.

11:45 a.m., shortly after Plant's father had left, and Plant made the confession in question.

Judge Cranston, in his decision on Plant's suppression motion, concluded that Plant's confession was voluntary. He found that Chief Daugherty possibly stated to Plant, shortly after his arrest, that he was in a lot of trouble and that if he started talking things would not be so hard. However, Judge Cranston found that this was the only possible statement made directly to Plant by a police officer which could be construed as a promise of leniency and that this statement, if made, did not have any effect on Plant's mental state or overbear Plant's will. Judge Cranston noted that, following the conversation with Chief Daugherty, Plant did not make any statement and was returned to his cell.

Judge Cranston found that Plant's father told Plant that, if Plant cooperated, the number of offenses with which Plant was charged, might be reduced. The court found, however, that Plant's father's statements to Plant were based on a misunderstanding of what Officer Eastham had said. The court concluded that Plant's father's representations were not, therefore, representations of the Homer police. The court noted that, in his statement to the police, Plant had stated that there had been no promises, threats, or coercion applied by anyone in the police station to induce Plant to make a statement. Judge Cranston concluded that the statements by Plant's father to Plant did not induce Plant to make a statement.

In determining whether a confession is voluntary, this court makes an independent determination based on the entire record. *Troyer v. State,* 614 P.2d 313, 318 (Alaska 1980); *Harris v. State,* 678 P.2d 397, 405–06 (Alaska App.1984), *rev'd on other grounds sub. nom., Stephan v. State,* 711 P.2d 1156 (Alaska 1985). The factual findings, however, will only be reversed if clearly erroneous. *See Johnson v. State,* 631 P.2d 508, 510 (Alaska App.1981). In *Stobaugh v. State,* 614 P.2d 767, 772 (Alaska 1980), the court stated: "The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement was such as to overbear [the defendant's] will to resist and bring about confessions not freely self determined." (quoting from *United States v. Ferrara,* 377 F.2d 16, 17 (2nd Cir.1967), *cert. denied,* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967)) (citations omitted).

Applying these standards, we conclude that Plant's confession was voluntary under the facts and circumstances of this case. Assuming that Chief Daugherty stated to Plant that Plant was in a lot of trouble and that Chief Daugherty suggested that Plant might benefit from cooperation, it appears that this admonition did not overbear Plant's will. In *Harris v. State, supra,* we concluded that where the defendant understands that the police are urging the defendant to cooperate, promising to bring the defendant's cooperation to the attention of the prosecuting authorities, no improper action has been taken, as long as, under the totality of the circumstances, the defendant's confession is voluntary. *Harris,* 678 P.2d at 405–06.

We find that Plant's will was not overborne in the present case. In any event, we also believe that the record supports Judge Cranston's finding that the statements, which Plant's father made to Plant, cannot be attributed to the police, and that those statements did not induce Plant to confess. We therefore conclude that the trial judge did not err in concluding that Plant's statements to the police were voluntary.

II.

■ Plant argues that his motion to dismiss the indictment should have been granted because the prosecutor failed to properly advise the grand jury of all the law applicable to the charged offense, second-degree burglary. More specifically, Plant contends that the prosecutor failed to provide the grand jury with the statutory definitions of terms used in the indictment to describe the conduct constituting the offense. The indictment charged: "That

on or about November 4, 1982, at or near Homer, in the Third Judicial District, State of Alaska, William E. Plant did enter and/or remain unlawfully in a building, Marquis Furniture store, with intent to commit the crime of theft therein."[6] The phrase "to enter or remain unlawfully" is defined in AS 11.46.350(a)(1)[7]; "building" is defined in AS 11.81.900(b)(3)[8]; "intentional conduct" is defined in AS 11.81.-900(a)(1).[9]

The pertinent question on appeal is whether the terms used in the indictment were sufficiently clear to be understood by the grand jury. *See Oxereok v. State*, 611 P.2d 913, 917 (Alaska 1980). We believe that the language of this indictment engendered no confusion in the minds of the jurors as to any of the elements of second-degree burglary. Furthermore, Plant has not argued that the evidence required any interpretation of statutory terms other than their plain meaning.[10] Therefore, we find no error.

### III.

Finally, Plant argues that District Court Judge William A. Greene was clearly mistaken in characterizing him as a worst offender, and in imposing the maximum sentence of one year for third-degree criminal mischief (joyriding). AS 11.46.484(a)(2); AS 12.55.135(a).[11]

This misdemeanor joyriding offense arose from Plant's burglary of the Marquis Furniture Store. When Plant realized that he could not open the safe in the store, he left the building and located a green pickup truck nearby which had the keys in the ignition. Plant then drove the truck to the store and used it to transport the safe to another location. Later, Plant returned the truck, undamaged, to where he had found it.

Plant argues that the worst-offender characterization by Judge Greene was unwarranted because Plant caused very little harm and because his criminal history was limited, for the most part, to offenses committed in February, 1982.

At the time of his sentencing, Plant was twenty-three years old. He had already pled to four counts of burglary and had confessed to at least two other burglaries

---

6. The language in the indictment closely follows the second-degree burglary statute, AS 11.46.-310, which provides:

   A person commits the crime of burglary in the second degree if the person enters or remains unlawfully in a building with intent to commit a crime in the building.

7. AS 11.46.350(a) reads in pertinent part:
   "[E]nter or remain unlawfully" means to (1) enter or remain in or upon premises or in a propelled vehicle when the premises or propelled vehicle, at the time of entry or remaining, is not open to the public and when the defendant is not otherwise privileged to do so.

8. AS 11.81.900(b)(3) provides:
   "[B]uilding", in addition to its usual meaning, includes any propelled vehicle or structure adapted for overnight accommodation of persons or for carrying on business; when a building consists of separate units, including apartment units, offices, or rented rooms, each unit is considered a separate building. . . .

9. AS 11.81.900(a)(1) provides:
   [A] person acts "intentionally" with respect to a result described by a provision of law defining an offense when the person's conscious objective is to cause that result; when intentionally causing a particular result is an element of an offense, that intent may not be the person's only objective. . . .

10. The evidence presented to the grand jury established that the Marquis Furniture Store in Homer closed at 5:00 p.m. on November 3. No one had permission to be on the store premises during the evening of November 3. A safe containing gold, cash and accounting books had been taken from the second floor office of the store during the evening hours. A handcart was also missing from the store. Additionally, Plant's statements to the police were also admitted into evidence. Plant had told the police that he broke in through the back door of the building, and that he used a handcart to remove a safe from the upstairs office and a pickup truck to transport the safe from the building.

11. This sentence was made consecutive to the 240 days that were imposed in other cases following probation revocation. Plant was later sentenced on four counts of burglary; he received a total sentence of ten years with seven years suspended. This felony sentence is concurrent with the misdemeanor sentence on appeal.

which he had committed in the fall of 1982. In March, 1982, Plant had been convicted of six misdemeanor offenses: two convictions for third-degree theft (including the theft of a truck) and three convictions for criminal mischief. In 1978, Plant was convicted of two counts of petty larceny for the theft of fishing gear. Judge Greene noted Plant had established a clear pattern of criminal conduct and concluded that a significant amount of incarceration was required to "break the cycle."

Given Plant's extensive criminal record, we conclude that Judge Greene was not clearly mistaken [12] in imposing the maximum sentence, despite the limited period of time in which Plant committed the offenses. Plant's record, coupled with the especially serious nature of this particular joyriding offense, *i.e.*, that it was committed in order to perpetrate a felony, justifies the sentence imposed.

Plant's conviction and sentence are AFFIRMED.

---

12. *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).