Carl THOMPSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–2183.

Court of Appeals of Alaska.

Jan. 20, 1989.

Charles R. Pengilly, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Carl Thompson was convicted, following a jury trial, of one count of first-degree murder, AS 11.41.100, an unclassified felony, and of one count of tampering with physical evidence, AS 11.56.610, a class C felony. Judge Jay Hodges sentenced Thompson to ninety-nine years on the first-degree murder conviction and to a consecutive five years on the tampering with physical evidence conviction. Thompson appeals his conviction and sentence. We affirm Thompson's conviction, but reverse his sentence.

On September 10, 1986, two moose hunters found the body of a dead woman floating in a gravel pit lake off the Elliott Highway. The hunters notified the Alaska State Troopers. The troopers discovered that the woman had been stabbed twenty-nine times. The body had been thrown into a water-filled gravel pit after being wrapped in chains, a bedspread, and a tent fly. The troopers advertised for information concerning the identity of the body, and directed the public's attention to a unique tattoo on the body. At the urging of his girlfriend, Carl Thompson called the troopers and reported that his former wife fit the description of the body which they had found and told the troopers that she had been missing since mid-August. Thompson told the troopers that he had taken his former wife to the airport in mid-August and that he had not seen her again. Through a dental examination, the body was conclusively identified as Thompson's former wife, Dixie Thompson.

On September 15, 1986, the trooper investigation had focused upon Carl Thompson as the person who had killed Dixie Thompson. Trooper Cris Stockard contacted Thompson and asked him to come to the trooper office to identify some property belonging to Dixie Thompson. However, Trooper Stockard's primary reason for contacting Thompson was to question him. Thompson went to the police station and was questioned extensively by Trooper Stockard. During the questioning, Trooper Stockard consistently assured Thompson that he was not under arrest and that he was free to go at any time. Thompson ultimately confessed to killing his former wife. Following his statement to the troopers, Thompson was allowed to leave the trooper headquarters. However, he was arrested approximately two hours later and was charged with murder in the first degree.

While Trooper Stockard was interviewing Thompson at the trooper headquarters, other troopers were executing a search warrant at Thompson's residence on Chena Hot Springs Road. The troopers seized a handgun during the search. Additionally, Luminol testing was done to check for the presence of blood in the residence. The test revealed a large concentration of blood in the kitchen area of the residence. The troopers also seized Thompson's truck.

The tires of Thompson's truck were of similar size and tread design to the tire impressions that the troopers had found near where Dixie Thompson's body had been discovered.

At trial, Thompson defended on the ground that he initially stabbed Dixie Thompson in self-defense. Thompson claims that he then lost control and killed Dixie in the heat of passion. Thompson asked the jury to convict him of the lesser-included offense of manslaughter. The jury ultimately convicted Thompson of murder in the first degree.

During deliberations, the jury sent a note to Judge Hodges asking for clarification of Jury Instruction No. 14.[1] The note stated:

> We need a legal interpretation of Page 14 referring to "serious provocation" [sic] "Can an introxicated [sic] person use serious provocation and/or Heat of Passion as a means of Defense."

The judge instructed the jury as follows:

> An intoxicated defendant can avail himself of the heat of passion and serious provocation defense but his conduct must be judged by how a reasonable sober person in the defendant's situation would react.

Defense counsel stipulated to that answer being given in response to the jury's question. Defense counsel, however, went on to argue that an additional instruction should be given on diminished capacity based on intoxication. After hearing argument from the defense and the prosecution, Judge Hodges declined giving any further instruction on intoxication.

■ Thompson argues that it was reversible error for the trial court to refuse to instruct the jury on a defense of diminished capacity based on intoxication. He suggests that the instruction was mandatory and requires reversal if it is "possible that [this] omission contributed to the jury's verdict[.]" *Stork v. State*, 559 P.2d 99, 101 (Alaska 1977).

At trial, Thompson's defense was that he was guilty only of the lesser-included offense of manslaughter because he acted in the heat of passion. Thompson also defended on the ground that he had diminished capacity to form an intent to kill based upon a mental disease or defect. However, it is clear that Thompson did not assert, prior to jury deliberation, the defense of diminished capacity based upon intoxication. He argues, however, that because the state contended that he was intoxicated when he committed the offenses and suggested that he was a mean angry drunk, such an instruction should have been given.

Both Thompson and the state cite *Des Jardins v. State*, 551 P.2d 181 (Alaska 1976). In *Des Jardins*, the supreme court stated:

> When a jury asks a judge about a matter on which it has received adequate instruction, the judge may in his or her discretion refuse to answer, or may refer the jury to the earlier instruction. When, however, the jury appears to be confused about a legal issue, and the resolution of the question is not apparent from an earlier instruction, the trial judge has a "responsibility to give the jury the required guidance by a lucid

---

1. Jury Instruction No. 14 stated:

    It is a defense to Murder in the First Degree, and Murder in the Second Degree involving intent to cause serious physical injury OR knowing conduct, if the defendant acted in a heat of passion at the time he killed Dixie Gutman Thompson before there had been a reasonable opportunity for the passion to cool, when the heat of passion resulted from a serious provocation by the intended victim.

    "Heat of passion" as the term is used in our law means such passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question, and such as would cause him to act rashly, without reflec-

tion and deliberation, and from passion rather than judgment. "Passion" or "heat of passion" is a term which encompasses a broad range of intense emotions including, but not limited to, fear, fright, terror, anger, rage or wild desperation.

    "Serious provocation" as used in these instructions means conduct which is sufficient to excite an intense passion in a reasonable person in the defendant's situation, other than a person who is intoxicated, under the circumstances as he reasonably believed them to be. Insulting words, or hearsay reports of conduct engaged in by the intended victim, do not alone or in combination with each other, constitute serious provocation.

statement of the relevant legal criteria. When a jury makes explicit its difficulties, a trial judge should clear them away with concrete accuracy."

*Id.* at 190 (footnote omitted).

In addition, Thompson cites to III *Standards for Criminal Justice* § 15–4.3 (2d ed. 1986). However, the Commentary to Standard 15–4.3(b) provides in part: "It is generally agreed that, when giving instructions in response to a jury request, the judge may confine himself or herself to the particular questions asked by the jury and need not give additional instructions, even though requested to do so by the defendant." *Id.* (footnote omitted).

We conclude that Judge Hodges did not abuse his discretion in refusing to instruct the jury on the defense of diminished capacity due to intoxication. Thompson's main defense was that he acted in the heat of passion and was therefore guilty of manslaughter, rather than first-degree murder. The jury question focused on this defense and asked the judge whether a person who was intoxicated could avail himself of heat of passion as a defense. Judge Hodges' instruction directly answered the jury's question. Thompson never argued that he was incapable of forming an intent to kill based on diminished capacity due to intoxication. Although there was evidence that suggested that Thompson had been intoxicated during the events which ultimately led to Dixie Thompson's death, neither the state nor Thompson had suggested that Thompson was incapable of forming a specific intent to kill. There is no reason to believe that the jury independently was focusing on this issue. Rather, the jury seems to have focused on the major defense which Thompson raised. We find no abuse of discretion.

█ Prior to trial, Thompson argued that the statement which he made to Trooper Stockard on September 15, 1985, should be suppressed. Thompson argued in the trial court that the troopers were required to give him *Miranda* warnings before he talked to them and contended that his statement was not voluntary. Judge Hodges found that the troopers were not required to give Thompson *Miranda* warnings because Thompson was not in custody at the time that he made the statement. He also found that Thompson's statements to the troopers were voluntary.

In *Hunter v. State,* 590 P.2d 888 (Alaska 1979), the supreme court held that the police were required to give a person *Miranda* warnings where he was subject to custodial interrogation. The court adopted an objective reasonable person test for determining whether a suspect was in custody. *Id.* at 895. The court stated:

At least three groups of facts would be relevant to this determination. The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and defendants said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested —may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Id.* at 895 (footnotes omitted). *See also Quick v. State,* 599 P.2d 712 (Alaska 1979); *Lowry v. State,* 707 P.2d 280 (Alaska App. 1985).

In arguing that Judge Hodges erred in finding that the police were not required to give Thompson *Miranda* warnings, Thompson does not really argue that he was in custody when the interview occurred. He concedes that "[he] may or may not have been in a custodial setting at the time he was interrogated." Instead, Thompson argues that the police intentionally interrogated him in such a way as to circumvent the

requirements of *Miranda.* He contends that the police went out of their way to set up circumstances where Trooper Stockard's questioning of Thompson would not be custodial so that Trooper Stockard would not have to give Thompson *Miranda* warnings. In his written decision finding against Thompson on this issue, Judge Hodges appears to have found that the police intentionally arranged to interrogate Thompson in a non-custodial manner to increase the likelihood that they would get a statement from him. Judge Hodges described this as a "devious police tactic." However, Judge Hodges concluded that the proper test was whether a reasonable person would believe that he was free to leave. Judge Hodges concluded that Thompson, as a reasonable person, would have felt free to break off the interrogation and leave. It seems clear that Judge Hodges applied the correct test under *Hunter.* As we have pointed out earlier, Thompson does not really contend that he was in custody at the time that he was questioned by Trooper Stockard. Thompson, responding to Trooper Stockard's request, went to the trooper headquarters on his own. Trooper Stockard assured Thompson numerous times that he was free to leave, that he was not under arrest, and that after the questioning finished, Thompson was free to go. And, in fact, Thompson was allowed to leave after the interrogation ended. Under these circumstances, we agree with Judge Hodges that the appropriate test is the one set forth by the supreme court in *Hunter.* Applying the *Hunter* test, it seems clear that Thompson was not in custody and that the police were not required to give Thompson *Miranda* warnings.

■ Thompson next argues that his statement was not voluntary. Thompson's primary complaint is the manner in which the troopers conducted the interview. Thompson points out that the troopers played on his sympathies, minimized his guilt, and placed much of the blame for the homicide on the victim. Trooper Stockard told Thompson that it was important for Thompson to tell his side of the story so that Trooper Stockard could present that version to the district attorney. Trooper Stockard warned Thompson that if he did not say anything, the district attorney might conclude that Thompson had committed murder in the first degree. Trooper Stockard suggested that if Thompson gave his side of the story, it was possible that Thompson might only be guilty of a lesser charge, such as negligent homicide, and would be facing a minimal sentence such as two to five years.

In his brief, Thompson sets out the correct legal standard for reviewing the voluntariness of confessions: "The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement was such as to overbear [the defendant's] will to resist and bring about confessions not freely self determined." *Stobaugh v. State,* 614 P.2d 767, 772 (Alaska 1980) (quoting *United States v. Ferrara,* 377 F.2d 16, 17 (2nd Cir.1967)).

■ In *Sprague v. State,* 590 P.2d 410 (Alaska 1979), the Alaska Supreme Court articulated a test for determining whether a confession was voluntary or involuntary. The court held that "[i]n determining whether a confession is voluntary or is the 'product of a mind overborne by coercion,' this court has previously stated that it will consider the 'totality of circumstances surrounding the confession' and conduct an independent review of the record." *Id.* at 413 (footnote omitted). In considering the totality of the circumstances, the following are relevant criteria: (1) age, mentality, and prior criminal experience; (2) length, intensity, and frequency of interrogation; (3) the existence of physical deprivation or mistreatment; and (4) the existence of threat or inducement. *Id.* at 414.

In *Harris v. State,* 678 P.2d 397 (Alaska App.1984), *rev'd on other grounds, Stephan v. State,* 711 P.2d 1156 (Alaska 1985), this court dealt with the issue of inducement. The police told Harris that if he cooperated with them by telling the truth, his cooperation would be brought to the attention of the prosecutor. This court concluded that such "inducement is not im-

proper as long as, under the totality of the circumstances, the defendant's confession is voluntary." *Id.* at 405–06. *See also Plant v. State,* 724 P.2d 536, 541 (Alaska App.1986) (defendant's confession voluntary and will not overborne even though defendant was told by police that he was in a lot of trouble and that he might benefit from cooperation).

Thompson was twenty-nine years old at the time he made the confession. Thompson argues that he dropped out of high school and that he was "borderline retarded." However, Dr. Feldman, the psychologist and defense witness who testified about Thompson's retardation, actually testified that he believed that Thompson was of low average intelligence. Dr. Feldman testified that Thompson's scores on the intelligence tests were inaccurate on the low side because of the circumstances under which the tests were given.

Thompson has had "prior criminal experience." He was convicted of minor in possession in 1975; receiving or concealing stolen property in 1976; disorderly conduct in May 1986; and second-degree theft in October 1986. Thompson was dealing with the police on the theft offense prior to his interrogation.

Thompson went voluntarily to the police station at the request of the troopers. He was not advised of his *Miranda* rights. He was, however, advised several times that he was free to leave during the interview, prior to his confessing. The interview lasted about two hours. He was interviewed by two troopers in a small interview room. Neither trooper was in uniform, nor were guns displayed.

The statements which the police made to Thompson to encourage him to talk to them appear to be similar to the inducements which we concluded were not improper in *Harris* and in *Plant.* We conclude that the inducements which the police made to Thompson were not "such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." We conclude that Thompson's confession was voluntary.

■ During the trial, the state played the portion of Thompson's statement where he admitted killing his former wife. Thompson asked to have the entire statement played to the jury. Judge Hodges concluded that the portion of the statement that was played was a fair assessment of what occurred and ruled against playing the first portion of the tape. Thompson points to Alaska Evidence Rule 106, which states:

> *Remainder of, or Related Writings or Recorded Statements.*
>
> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

The decision whether to admit or to exclude evidence under A.R.E. 106 is reviewed under an abuse of discretion standard. *Stumpf v. State,* 749 P.2d 880, 899 (Alaska App.1988). In *Stumpf,* we held that:

> [W]hen the state ... presents one part of a conversation or statement ..., the defendant may be entitled to offer or require the state to offer, the rest of the statement or conversation in order to set the context for statements already in evidence. Nonetheless, the admitted portions of the statement need not be admitted if they are not relevant to explain or clarify the previously admitted statement.

*Id.* (citation omitted).

The statement which Thompson wished to admit in its entirety was an approximate two-hour interview. Much of that interview consisted of Trooper Stockard talking to Thompson. Under these circumstances, we conclude that Judge Hodges did not abuse his discretion in determining that, on direct examination, the state could introduce only the part of the statement where Thompson admitted killing his former wife. Judge Hodges indicated that he might or might not permit certain portions of the statement to be played to the jury during cross-examination. Thompson has not

pointed out to us specific portions of the tape which he was not permitted to play to the jury either for purposes of cross-examination or as evidence during his case-in-chief. We conclude that Judge Hodges did not err in limiting the portion of the tape which was played to the jury during the state's case-in-chief.

■ Thompson next contends that his sentence was excessive. Thompson was convicted of murder in the first degree, which is an unclassified felony with a maximum penalty of ninety-nine years and a minimum penalty of twenty years. He was also convicted of tampering with physical evidence, which is a class C felony with a maximum penalty of five years. Judge Hodges sentenced Thompson to the maximum sentence on both convictions, and imposed those sentences consecutive to each other. Thus, Thompson has a composite sentence of one hundred and four years.

At the time of sentencing, Thompson was thirty years old. Thompson had previously been convicted of four minor misdemeanor offenses. Thompson was not sentenced to imprisonment on any of the misdemeanor offenses. At the time that he committed the present offense, Thompson was charged with theft in the second degree, a class C felony, AS 11.46.130(a)(1). Thompson was ultimately sentenced to three years with two and one-half years suspended on the theft offense. In sentencing Thompson, Judge Hodges concluded that Thompson might not be a worst offender because he did not have a long history of criminal involvement. However, he classified the murder itself as a worst offense. He emphasized the explosive relationship that existed between Carl and Dixie Thompson throughout the course of their relationship.

Judge Hodges indicated that there was evidence that Thompson was at least involved with the use of drugs for his personal use and that a possible motive for the killing may have been that Thompson was concerned that Dixie Thompson might in-

form on him. Judge Hodges indicated that he had difficulty believing Thompson's version that he acted either in self-defense or in the heat of passion because Thompson's version of the offense did not match the physical evidence. In concluding that this was a particularly aggravated murder offense, Judge Hodges pointed out that Thompson had stabbed his former wife twenty-nine times. Thompson then disposed of the body by taking it to a gravel pit in an isolated area and wrapping the body with canvas and chains.

We conclude that Judge Hodges was not clearly mistaken in imposing the maximum sentence of ninety-nine years for murder in the first degree. In *Riley v. State*, 720 P.2d 951, 952 (Alaska App.1986), we pointed ed out that we were not aware of any decision of this court or the Alaska Supreme Court which held that a maximum sentence for murder in the first degree was excessive. In *Riley*, we pointed out that under the present first-degree murder statute, many cases which would have been second-degree murder under the former statutes were now included as murder in the first degree. We stated that "[i]n such cases, sentence appeals dealing with second-degree murder convictions under prior law may well provide an appropriate point of reference." *Id.* at 952 n. 1. In the instant case, however, we believe that the reasons which Judge Hodges gave were sufficient to justify imposition of the maximum sentence.

■ We do not believe, however, that the record supports imposing the sentence for tampering with evidence consecutively to the ninety-nine-year murder sentence. In order to justify imposing a sentence consecutive to the ninety-nine-year murder sentence, the trial court would have to find that confinement of the defendant for the aggregate period of the consecutive sentence was necessary to protect the public. *Mutschler v. State*, 560 P.2d 377 (Alaska 1977).[2] We do not believe that a sentence

**2.** In *State v. Andrews*, 707 P.2d 900, 908, 910 (Alaska App.1985), *aff'd per curiam*, 723 P.2d 85 (Alaska 1986), we concluded that AS 12.55.-

025(e) established a legislative preference for consecutive sentences. In *Jones v. State*, 744 P.2d 410, 411 (Alaska App.1987), we indicated

in excess of ninety-nine years can be justified except where the trial court finds that in order to protect the public the defendant must spend the rest of his life in prison without any possibility of parole. *See, e.g., Nukapigak v. State,* 663 P.2d 943 (Alaska 1983); *Hastings v. State,* 736 P.2d 1157 (Alaska App.1987). Where the record did not support this finding, we have previously not approved sentences in excess of the ninety-nine-year maximum term for murder. *Ridgely v. State,* 739 P.2d 1299 (Alaska App.1987); *Page v. State,* 657 P.2d 850 (Alaska App.1983).

■ Judge Hodges did not find that it was necessary to sentence Thompson to spend the rest of his life in prison without any possibility of parole to adequately protect the public. We do not believe that the record in this case would support such a finding. We do not believe that the record supports the conclusion that Thompson must be incarcerated for the remainder of his life without any possibility of parole. We accordingly conclude that the trial court should not have imposed the sentence for tampering with physical evidence consecutively to the ninety-nine-year sentence for murder. We therefore find Thompson's sentence to be clearly mistaken. We order the trial court to impose Thompson's sentence for tampering with evidence concurrent to his sentence for murder.

The conviction is AFFIRMED. The sentence is VACATED and the case is RE-MANDED for resentencing consistent with this opinion.

that the legislative preference for consecutive sentences must be interpreted to expand the situations where the court may impose consecutive sentences. In *Jones,* we upheld the trial judge's conclusion that Jones' offenses were so serious that a consecutive sentence was necessary to reflect the seriousness of the crime. *Jones,* 744 P.2d at 412. However, we do not believe that the record in this case establishes any substantial reasons for imposing a sentence greater than the ninety-nine year maximum sentence for first-degree murder.