Michael ALEXANDER, Appellant,

v.

STATE of Alaska, Appellee.

No. A–2764.

Court of Appeals of Alaska.

Aug. 21, 1992.

Rehearing Denied Oct. 23, 1992.

James M. Hackett, Fairbanks, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before COATS, J., and ANDREWS and WOLVERTON, Superior Court Judges.*

COATS, Judge.

A jury convicted Michael Alexander of first-degree murder and kidnapping. AS 11.41.100(a)(1); AS 11.41.300(a)(1). Superior Court Judge Jay Hodges sentenced Alexander to the maximum ninety-nine-year sentence on each conviction, imposed these sentences consecutively, and ordered that Alexander would not be eligible for parole. Alexander appeals his conviction and sentence. We affirm.

K.S., a West Valley High School student, left her Fairbanks, Alaska home around 8:45 p.m. on March 23, 1987, to return to nearby West Valley High to retrieve a book from her locker. K.S. never returned home. K.S.'s parents found the family automobile in the West Valley High parking lot with the engine running and the keys in the ignition. The body of the young girl was found on the outskirts of Fairbanks on March 24, 1987, around 11:30 p.m., lying in the snow on the side of Springer Road.

After a much publicized police investigation which had concentrated on several key suspects, Alaska State Troopers (AST) arrested appellant Michael Alexander. At trial, the state relied heavily on blood, hair, fiber, and glitter evidence to link Alexander to K.S.'s body. Jeff Dayton testified that he found the decedent's body at about 11:30 p.m. on March 24, 1987. Trooper Richard Smith testified that he responded to the scene after midnight and photographed tire marks and footprints. Forensic pathologist Michael T. Propst estimated decedent's death at about 2:00 a.m. on March 24, 1987. Based on lividity patterns, Propst opined that the victim had been placed on her back and then later moved and placed face down.

AST Investigator James McCann explained the importance of trace evidence which is transferred to and from the crime scene; testified that there was no evidence of a struggle at the scene of the abduction; stated that, when he arrived at the Springer Road location, decedent's body had not yet assumed the temperature of the scene; noted that there was a fingerprint on the victim's shoe that was never identified; and testified that he observed glitter-like material on the decedent's body. Through Investigator McCann, the state played recordings of interviews in which Alexander told police that he had been sitting in his car the night K.S. was abducted, that he had witnessed some people put her into a red car as she screamed, and that he then went to a Denny's restaurant without reporting the incident to the police.

The state introduced evidence of stains found on decedent's underpants. FBI Serologist Mark Babyak testified that semen stains on K.S.'s undergarments had the presence of both A and H factors in two stains, consistent with a person having type A blood and being a secretor; Agent Babyak testified that Alexander was type A and a secretor. Babyak further stated that he found dried stains with the H factor alone, consistent with a person having type O blood and being a secretor. While he did not know whether K.S. was a secretor, Agent Babyak testified that she had type O blood. Babyak testified that in the five stains with only H factors, the H factor came either from the victim or from the semen of an O-type secretor. However, the agent also stated that the stains with A-type factors had to have come from someone with type A blood and could not have come from someone, like the victim, with type O blood.

Several law enforcement officers testified regarding seizures of hair, fiber, fabric, glitter, debris, and other trace evidence from Alexander's car and two of his residences. Alexander's estranged wife, Darla, testified that she surrendered several bottles of glitter to police which had been in the family residence for use by the children during the time Alexander lived there. Toni Harris described furniture and chattels she had helped Alexander move from his family residence to another apartment.

FBI Agent Robert Webb testified as a polymer expert that glitter particles found

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

on the decedent's body and clothing, and the medical examiner's sheets, were "identical" or "consistent" with the glitter samples surrendered by Darla Alexander. FBI Agent Chester Blythe testified as a hair and fiber expert that two head hairs and a pubic hair found on the decedent's clothing were "consistent with having come from [Alexander]." He testified that it was rare, but not impossible for a person to have head hair which matched another person and also to have pubic hairs which matched the same person. Blythe testified that he found fibers on the decedent which were "the same," "identical," or were consistent with samples taken from Alexander's car and his couch. Blythe also found hair fragments on the victim, too small for comparison, consistent with African–American hair types. Alexander is African–American.

Thomas Wickham, the manager of the Mom & Pop's grocery store near the school and Alexander's employer, testified that Alexander's time card showed that Alexander did not clock in on March 23 (the day K.S. disappeared) and that Alexander had worked from 1:30 to 2:30 p.m. on March 24 (the day the body was found).

The defense strategy at trial was to establish or suggest a nearly complete alibi, that the physical evidence was inconclusive, and that someone else—possibly another suspect such as Robert M. or Bob H.—had committed the crimes but the police had accused Alexander in a rush to close the case.

Two defense witnesses stated that they drove down Springer Road at 7:30 and 9:30 p.m., respectively, on the evening of March 24, and saw no body on the roadside. Two additional witnesses testified that between 10:00 p.m. and midnight on March 24 they saw a Caucasian man along the side of Springer Road in the area where the body was later found. Burbie Robar testified that, at some time after 9:00 p.m. on the night of March 24, she had to swerve to avoid hitting a Caucasian man who was alongside a dark car parked on the shoulder of Springer Road in the area where the body was discovered. She stated that the man was carrying something that appeared to be a large, red, wet bundle—possibly something wrapped in a blanket or sleeping bag. Trooper Carol Solomon testified for the defense that she had seen the vehicle of another suspect in the case, Robert M., in the area at around 11:00–11:30 p.m. that same night. Robar was unable to identify Robert M., a Caucasian, as the man she had seen alongside Springer Road.

Alexander called witnesses to establish his whereabouts on the night of March 23 and 24. Gilbert Somers testified that he had seen Alexander at the Mom & Pop's on March 23 between 7:00 and 8:00 p.m. and believed that he recalled Alexander saying something about meeting someone later at a Denny's restaurant. Arthur Fournier, an employee of Mom & Pop's and a classmate of the victim, testified that Alexander was in the store between 7:00 and 8:00 p.m. on March 23 and that it was not unusual for Alexander to be around when he was not scheduled to work. On March 24, according to Fournier, Alexander was working at Connie's Music Studio at about 10:00–11:00 p.m. Fournier stated he talked to Alexander from approximately 11:00 p.m. until midnight. Tonya Brownlie testified that Alexander helped her lockup her salon, located next to Mom & Pop's, at about 10:00 p.m. on March 24.

Pastor Robert Eason testified that he saw Alexander at Mom & Pop's during the evening of March 23 and at noon on March 24. He further testified that, on the night of March 24, Alexander came to his wife's shop, Connie's Music Studio, and helped paint. Pastor Eason testified that Alexander was with him at the studio from about 9:00–10:00 p.m. until 3:30–3:45 a.m. the next day. Eason's wife also testified that she had seen Alexander at the studio at about 10:00 or 11:00 p.m. on March 24. Pastor Eason testified that when the police arrested Alexander he was present, and, when they interviewed Eason and he related being with Alexander on March 24, the police called him a liar and "got real upset."

The defense called AST Investigator Paul Bartlett. Bartlett testified that, al-

though he made tire and footprint impressions at the West Valley High parking lot and the Springer Road location, he was unable to link any impressions to Alexander. He also stated that he had, at one point, concentrated the investigation on Robert M. and accused Robert M. of murdering the victim.

Robert M. and Bob H. were called by the defense. Both men described being accused by the police of involvement in the murder and having been subject to intense police scrutiny. Timothy Gilbert testified that police told him that they had "good evidence" against Robert M., that he wore a wire to record conversations with Robert M., and that Robert M. asked him to fabricate an alibi for him for the night of March 23. Both Robert M. and Bob H. denied any involvement in the crimes.

Defense investigator Robert Nearing testified that it took 35 minutes to travel 28 miles, one way, from Alexander's residence to the Springer Road location. He further testified that the 32.8 miles from the high school to the Springer Road site took 45 minutes to drive at the speed limit.

Benjamin Smith, a West Valley High student, testified that he left the parking lot area (where the victim's car was later found) at 9:30 p.m. on March 23 but that K.S.'s car was not in the lot at that time. The state called Amy Voigt, as a rebuttal witness, to testify that she saw K.S.'s car in the lot at about 8:50 p.m. on March 23 when she picked her sisters up at West Valley High.

The defense argued that, in their rush to close the case, the police had accused the wrong person and that, based on the testimony of the witnesses who testified that Alexander was with Eason the night of March 24, it was impossible for Alexander to have dumped K.S.'s body on Springer Road.

The jury rejected the defense theory and convicted Alexander of kidnapping and first-degree murder.

■ Alexander first contends that Judge Hodges erred in denying his motion for a change of venue from Fairbanks. The

state concedes that Fairbanks' media covered the K.S. murder and investigation extensively. Local newspaper articles commented on the purported strength of the case against Alexander, reported the existence of forensic evidence, and discussed Alexander's prior criminal record. Alexander claims that Judge Hodges erred in not allowing him the opportunity to show, in a pretrial hearing, that there was a substantial likelihood that he could not receive a fair trial in Fairbanks.

■ The right to an impartial jury is guaranteed by the sixth amendment to the U.S. Constitution and article 1, § 11 of the Alaska Constitution. Alaska Statute 22.-15.080(1) permits the trial court to change the venue of a trial when "there is reason to believe that an impartial trial cannot be had."

In *Wylie v. State*, we stated:

Generally, criminal trials should be held where the alleged offense occurred. Nevertheless, the trial court has discretion to change venue where necessary to ensure a fair trial. The general rule is that jury selection should be commenced in the venue of the crime and then moved only if voir dire reveals that an impartial jury cannot be obtained.

797 P.2d 651, 656 (Alaska App.1990) (citations omitted). In *Chase v. State*, we stated that: "[A] trial judge will seldom be found to have abused his discretion in denying a motion for change of venue prior to jury *voir dire*." 678 P.2d 1347, 1350 (Alaska App.1984). The *Chase* decision quoted from *Mallott v. State*:

Whether pretrial publicity is so prejudicial and so pervasive that no such jury could be selected to try a particular case in a particular locale is a determination that is exceedingly difficult to make prior to the questioning of potential jurors. Therefore almost without exception trial courts have been permitted the discretion to rely on voir dire rather than their own speculation as to the impact of pretrial publicity.

608 P.2d 737, 746 (Alaska 1980). It is therefore clear that Judge Hodges did not abuse his discretion in conducting a *voir*

273

*dire* examination to attempt to select an impartial jury in Fairbanks.

From the record, it does not appear that there is any reason to conclude that the jury which tried Alexander was other than impartial. In the instant case, of the thirty-one people the attorneys questioned, Alexander challenged only one prospective juror for cause related to pretrial publicity; the challenge was granted. The parties agreed to release another person due to his exposure to the case and his feelings about it. Alexander did not challenge any of the selected jurors for cause,[1] and did not request additional peremptory challenges. Alexander individually and privately questioned each prospective juror extensively about what they might know about the case, the victim, the defendant, and the witnesses. The selected jurors all stated that they had only heard or read basic background and rumor about the case and were not acquainted with the specifics of the case or the details of the accusations.

After selecting a jury, Alexander did not renew his motion for a change of venue. When a defendant does not renew his motion to change venue after jury *voir dire,* the failure to renew the motion is considered to be an "apparently deliberate waiver" of the motion to change venue. *Mallott,* 608 P.2d at 748; *Wylie,* 797 P.2d at 656. We note that although Alexander has contended that his attorney did not adequately represent him in other respects, he has not alleged that his trial attorney erred in failing to renew the motion for change of venue. Indeed, from the record before us, it appears that Alexander and his attorney could well have failed to renew the motion to change venue because Alexander and he were satisfied that the jury was impartial. We accordingly find no merit to Alexander's contention that Judge Hodges erred in denying his motion to change venue.

Alexander next raises several contentions that he received ineffective assistance from his trial counsel. Our supreme court has established a two-pronged test to determine whether a defendant is entitled to a new trial based on claims of ineffective assistance of counsel. *Risher v. State,* 523 P.2d 421 (Alaska 1974). *Risher* provides that the defendant must initially show that his attorney's conduct fell below the minimal range of competence required of a counselor "with ordinary training and skill in the criminal law." *Id.* at 424. The attorney's reasonable tactical decisions are virtually immune from subsequent challenge even if, in hindsight, better approaches could have been taken. *State v. Jones,* 759 P.2d 558, 569–70 (Alaska App. 1988). The second prong is satisfied by a showing, by the defendant, of prejudice. *Id.* at 572. The defendant must establish that a reasonable doubt exists that his attorney's incompetence contributed to the verdict. *Jackson v. State,* 750 P.2d 821, 824 (Alaska App.), *cert. den'd,* 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 56 (1988).

The United States Supreme Court has held that the sixth amendment requires that a defendant be afforded a new trial if "[t]he defendant [can] show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Alexander extensively discusses the standard which courts in Alaska should apply to ineffective assistance of counsel claims and contends that Judge Hodges did not apply a correct test in evaluating his claims. Alexander apparently agrees with the trial court's interpretation of the first part of the *Risher* test: that the defendant must initially show that his attorney's conduct fell below the minimum range of competence required of a counselor "with ordinary training and skill in the criminal law." 523 P.2d at 424. However, Alexander quarrels with the trial court's interpretation of the prejudice prong of the *Risher* test. We believe that *Jones,* 759 P.2d at

---

**1.** Alexander was denied a challenge on S.F., an alternate who did not participate in the verdict. The defense was concerned that the alternate juror knew two of the witnesses.

572–73 presents a thorough discussion of what the defendant must show to establish prejudice under the *Risher* standard. In *Jones,* we stated:

Although *Risher*'s prejudice prong is significantly less demanding than *Strickland*'s, the state and federal standards are nevertheless similar in one important feature: both impose upon the accused the affirmative burden of proving prejudice....

....

Because *Risher* and *Strickland* alike require the accused to prove both incompetence and actual prejudice, it follows that a mere conclusory or speculative allegation of harm will not suffice. The accused must do more than present "abstractions without context." Once the performance prong of the *Risher* standard has been established, the accused must, in addition, make a specific factual showing that counsel's incompetence had some actual, adverse impact on the case—that is, the accused must prove "some effect of [the] challenged conduct on the reliability of the trial process[.]"

....

... Once the accused demonstrates that trial counsel's incompetence actually had an adverse effect on the case, the court, under *Risher,* need only find a reasonable doubt that the incompetence contributed to the conviction.

When, on the other hand, the accused fails to allege or show that counsel's incompetence resulted in any actual adverse impact and relies instead on the fleshless allegation that prejudice in some imaginable but unsubstantiated form was reasonably possible, the burden of proving prejudice is not satisfied.

*Id.* (alterations in original) (citations omitted).

After an extensive evidentiary hearing, Judge Hodges made oral findings. As we have previously stated, Alexander made numerous claims that his attorney did not adequately represent him in trial. As to most of these claims, Judge Hodges found that Alexander's trial attorney provided adequate representation. However, Judge Hodges found that trial counsel had not effectively represented Alexander in some areas. He concluded that trial counsel should have obtained work data from the FBI which would have helped counsel to evaluate the FBI testing. He found that trial counsel was ineffective in failing to have the glitter and fiber evidence independently tested and in failing to retain a forensic expert to assist him in cross-examination. He also concluded that trial counsel was ineffective in not being more familiar with Alexander's recorded statements, which were on eleven hours of tape, to possibly present further statements from the tape. However, Judge Hodges concluded that these alleged errors by trial counsel did not prejudice Alexander. In making this finding, Judge Hodges stated:

With respect to the second prong, the defense must show ... the trial counsel's failure to perform as a competent counsel would create a reasonable doubt that the verdict had been affected.... [B]ased on the evidence which the court has had an opportunity to listen to throughout the course of the trial as well as the evidence which was presented at the time of the evidentiary hearing, ... even if the evidence had been presented at trial the verdict would not have been different.

It appears to us that Judge Hodges used the correct standard in evaluating whether Alexander had established prejudice.

We have extensively reviewed the evidence which Judge Hodges considered in rejecting Alexander's motion for a new trial which was based on ineffective assistance of counsel. We conclude that his findings are supported by the record. At the evidentiary hearing on the ineffective assistance of counsel issue, Alexander's main witness was Lucien Haag, an expert on forensic evidence. He testified concerning the glitter, hair, and fiber evidence which the state presented at Alexander's trial. From our review of Haag's testimony, we believe that Judge Hodges could properly find that an expert like Haag would have been useful to Alexander's trial counsel for cross-examination and to independently test glitter, hair, and fiber evi-

dence.[2] However, Judge Hodges could properly conclude Haag's testimony did not significantly undermine the testimony of the FBI's experts.[3] In particular, Haag conceded the importance of the fact that Alexander's head and pubic hairs were comparable to hairs which the police found on the victim's body. Basically, Haag conceded that nothing which he found would exclude Alexander as the murderer and that much of the evidence pointed toward Alexander.

With respect to Alexander's argument that his trial counsel should have been more familiar with the statements which he made during his eleven hours of conversation with the police, appellate counsel has not shown how admission of any additional statements which Alexander made might have had an impact on his case.[4]

After thoroughly reviewing the record, we believe that Judge Hodges could properly find that in all other respects Alexander's trial counsel was effective. We accordingly conclude that Judge Hodges did not err in refusing to grant Alexander a new trial based on ineffective assistance of counsel.

■ Alexander next contends that his sentence was excessive. Judge Hodges sentenced Alexander to ninety-nine years of imprisonment for murder in the first degree and to a consecutive ninety-nine years of imprisonment for kidnapping. Judge Hodges imposed these sentences consecutively, and ordered that Alexander would be ineligible for parole for the maximum period of time allowable by law. Alexander points to *Thompson v. State*, where we stated:

> We do not believe that a sentence in excess of ninety-nine years can be justified except where the trial court finds that in order to protect the public the defendant must spend the rest of his life in prison without any possibility of parole.

768 P.2d 127, 133–34 (Alaska App.1989). Alexander argues that such a finding is inappropriate in his case.[5]

In the trial court and on appeal, Alexander pointed to his good military record, his good work record, his family support, and the progress which he had made in the community following his release from probation in 1982. In sentencing Alexander, Judge Hodges recognized these favorable

**2.** According to Alexander's trial counsel, he consulted with a forensic expert who reviewed the FBI's report. Counsel stated that he researched glitter manufacturing, reviewed a transcript from a similar forensic evidence case to aid in trial preparation, and felt that he was adequately prepared to cross-examine the FBI hair, fiber, and polymer experts in the case without having the evidence independently tested or retaining an expert to assist with cross-examination. A review of the trial attorney's cross-examination of the state's experts demonstrates this background.

**3.** We have considered the fact that counsel did not obtain the FBI work data as subsumed within the failure of counsel to obtain an independent expert to test the glitter, hair, and fiber evidence and to aid counsel in cross-examination. The parties and trial court treated this issue as subsumed.

**4.** At trial, Alexander's counsel argued that Alexander's statements to the police had been made in the context of eleven hours of questioning by police interrogators and that the brief statement placing Alexander near the scene of the abduction was "babble" which simply did not make sense. Appellate counsel has not made any spe-

cific suggestions concerning what other tactic would have been more effective to place Alexander's statements in context.

**5.** In *Stern v. State*, we stated:

> When a sentencing judge restricts parole eligibility, the judge must specifically address the issue of parole restriction, setting forth with particularity his or her reasons for concluding that the parole eligibility prescribed by AS 33.16.090 and AS 33.16.100(c)–(d) is insufficient to protect the public and insure the defendant's reformation. When the defendant's sentence is lengthy, as in Stern's case, Alaska law presumes that questions of discretionary release are better left to the Parole Board, since the Board evaluates the advisability of parole release in light of the defendant's tested response to Department of Corrections rehabilitative measures. However, because the Alaska legislature has affirmatively given sentencing judges the power to restrict or deny parole eligibility, this presumption (that parole release of long-term prisoners should normally be evaluated after the defendant has established an institutional history) must remain rebuttable.

827 P.2d 442, 450 (Alaska App.1992) (citations omitted).

qualities. However, Judge Hodges concluded from Alexander's present offense and his extensive prior record that Alexander had very poor prospects for rehabilitation, that he was a very dangerous offender, and that it was necessary to incarcerate Alexander for the remainder of his life in order to protect the public. Although we believe that such findings and such a sentence are appropriate only in rare circumstances, we believe that Judge Hodges' findings and sentence are supported by the record in this case. *See Nukapigak v. State*, 663 P.2d 943, 946 (Alaska 1983); *Washington v. State*, 828 P.2d 172, 175 (Alaska App.1992); *Stern v. State*, 827 P.2d 442, 450 (Alaska App.1992); *Weitz v. State*, 794 P.2d 952, 958 (Alaska App.1990); *Hastings v. State*, 736 P.2d 1157, 1160 (Alaska App.1987); *Krukoff v. State*, 702 P.2d 664, 666 (Alaska App.1985) (cases finding not clearly mistaken sentences that required the defendant to spend the rest of his life in prison without any possibility of parole).

In sentencing Alexander, Judge Hodges placed primary emphasis on Alexander's extensive criminal background. Alexander has several prior felony convictions. In 1969 he was convicted in Austin, Texas for passing a forged U.S. Treasury check. In 1971 at Ft. Leavenworth, Kansas, he was convicted of possession of heroin. In 1973 he was convicted of robbery in Anchorage, Alaska; the robbery was committed with a firearm. In October 1973 Alexander was again convicted of robbery; again the robbery was committed with the use of a firearm. In June 1976 Alexander raped a sixteen-year-old woman at knifepoint and was convicted in Anchorage of statutory rape and sentenced to seven and one-half years of imprisonment. In addition to these felony convictions, the state presented extensive evidence that Alexander had committed other prior assaults, including sexual assaults. Judge Hodges found this evidence to be credible and gave it weight in sentencing. This background supports Judge Hodges' conclusion that Alexander is a dangerous offender for whom there is little hope for rehabilitation. This record leads to the conclusion that Alexander's

history of prior assaultive conduct, particularly the sexually assaultive conduct, escalated to the instant offense. This history provides every reason to believe that Alexander would commit similar offenses if he were ever released from imprisonment. We accordingly conclude that Judge Hodges was not clearly mistaken in imposing a sentence which requires Alexander to spend the rest of his life in prison without any possibility of parole.

The conviction is AFFIRMED.

BRYNER, C.J., and MANNHEIMER, J., not participating.