Mason BILLINGSLEY, Appellant,

v.

STATE of Alaska, Appellee.

No. 1117.

Court of Appeals of Alaska.

March 29, 1991.

Blair McCune, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, District Court Judge.*

OPINION

COATS, Judge.

Mason Billingsley was convicted of robbery in the first degree, in violation of AS 11.41.500(a)(1). *Billingsley v. State*, Memorandum Opinion and Judgment No. 664 (Alaska App., August 15, 1984) [hereinafter *Billingsley I*]. At trial, the state introduced evidence of Billingsley's unrecorded custodial confession. *Id.* at 3. This confession has been the subject of numerous appellate proceedings. In the instant case, both parties are appealing from decisions of Superior Court Judge S.J. Buckalew, Jr., concerning this confession. Billingsley appeals from Judge Buckalew's finding that use of this confession at trial was harmless error. The state, in its cross-appeal, argues that Judge Buckalew erred in deciding Billingsley had not waived the right to argue that evidence of his confession should have been suppressed under *Stephan v. State*, 711 P.2d 1156 (Alaska 1985).

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

The facts of this case are set out in this court's decision in *Billingsley I*. Billingsley was charged and convicted of robbing a Qwik Stop store on June 1, 1982. *Id.* Because the error claim in this appeal concerns evidence which was introduced at trial, we will briefly summarize that evidence.

The first witness at trial was James R. Oswald, the Qwik Stop store clerk on duty the night of the robbery. The robbery occurred around 3:00 a.m. When Billingsley entered, Oswald moved behind the counter to help him. Billingsley stood two feet away from Oswald, facing him across the counter; Billingsley was not wearing a mask or any other form of disguise. Billingsley pointed a gun at Oswald and demanded the money in the cash register. Oswald gave Billingsley the money and watched as he left the store and walked across the parking lot to the Kathy-O Trailer park.

The police arrived one or two minutes after Oswald called to report the robbery. He gave the following description of the robber to Officer Willard Carter: a white male, approximately twenty-eight years old, about six feet tall, medium build, with a ruddy complexion, dark hair, a mustache, and an untrimmed beard about four inches long. He said the man was wearing a well-worn dirty blue jean jacket, dirty blue jeans, and tan scuffed square-toed boots. At trial, Oswald identified the clothing and boots seized from Billingsley as similar to those worn by the robber.

Three days after the robbery, Oswald was shown a photo-lineup of six men with beards. He picked out two pictures from this lineup which he said "resembled" the robber; one of these men was Billingsley. He identified Billingsley in court as the robber.

After the police spoke to Oswald, they went with a police dog to the place where Oswald said the robber had entered the trailer park. The police found what appeared to be a fresh footprint. The dog followed this scent for about fifty yards. The police were within forty feet of the trailer where Billingsley had been living that week.

Carter, who investigated the robbery, testified next. The prosecutor asked him if the day after the robbery he received a dispatch, "this time relating to someone or regarding someone who was—wanted to turn themselves in." Carter said this was correct. As a result of this dispatch, Carter went to "Don's Green Apple" restaurant and met Billingsley. He described Billingsley as having a ruddy complexion, dark hair, and a full, untrimmed beard, and he identified Billingsley in court. He described the clothing Billingsley was wearing: a faded blue jean jacket, blue jeans, a plaid shirt, and square-toed scuffed up brown boots. He also identified the seized clothing in court.

Carter drove Billingsley to the Anchorage Police Station. He took him to Lieutenant Foster's office. Carter testified that Billingsley began to make statements to the two officers that "I did it, . . . I held up the place." Carter told him to wait, then read him his *Miranda* rights, and had him sign a form waiving those rights.

Carter testified to the confession which Billingsley made. Billingsley explained that he was a heroin addict who robbed the store to get money to purchase the drug; he had turned himself in because he wanted help for his drug problem. According to Carter, Billingsley told him details of the robbery that Billingsley would not have known unless he committed the robbery. Carter testified that Billingsley told him he had committed the robbery with a .44 Ruger handgun with a 7½" barrel which he had removed from a brown holster and pointed at the Qwik Stop clerk with a two-handed grip. Billingsley told Carter that he was hiding in the trailer and saw Carter attempt to track him. Billingsley stated he got $40 from the robbery. Carter testified that he did not record this interview because there were no blank tapes available.

Carter reported that Billingsley exhibited physical symptoms which indicated to him that he was in light to moderate narcotics withdrawal and said that Billingsley told him he had a "4 spoon" per day heroin

addiction. Carter estimated, based on his experience, that four spoons of heroin would cost $400.

Billingsley took the stand and testified in his own defense and denied committing the robbery. He said he read an article in a local newspaper about the robbery. He said he had been drinking a lot and was contemplating suicide. He called the police from Don's Green Apple and said that he wanted to turn himself in. He said he confessed to a crime he did not commit in order to be locked up. On cross-examination, the prosecutor impeached Billingsley by referring to the statement he had made to Carter. Billingsley denied making some of the statements Carter said he had made. He said that he told Carter that he had seen the police and a tracking dog while hiding in a trailer immediately after the robbery. The officer told him about the tracking on the way to the police department.

Billingsley said he lied to the police about being addicted to heroin, because he thought they would be more willing to help him get into a rehabilitation program if he said he was addicted to drugs rather than alcohol.

Billingsley stated that the clothes he was wearing on June 2, when he spoke to the police, were the same clothes he was wearing the day before, except he had changed his boots. In the patrol car on the way to the police station, when asked whether he committed the robbery, Billingsley responded "yeap." Billingsley testified that this response had been a lie.

Billingsley's defense at trial was an alibi. Gregory Dahl, an alibi witness, testified for the defense. He testified that Billingsley had been staying with him in his trailer at the Kathy–O Trailer park for about a week as of June 1, 1982. At 11:00 p.m. on the night of June 1, Billingsley went out to a local bar to drink; he returned to the trailer at 1:00 a.m. Dahl said that he had stayed awake all night since he worked nights and normally slept during the day.

In closing arguments the prosecutor theorized that Billingsley confessed because he thought if he said he had a bad heroin habit and needed help, he might get a sympathetic reaction from the police. The prosecutor stated that since Billingsley did not get a sympathetic reaction, he was now lying in order to evade criminal responsibility.

The prosecutor emphasized Billingsley's confession to Carter, pointing out that Billingsley had told the officer details of the robbery that only the actual robber would know. Defense counsel asked the jury to find that Billingsley was driven to confess to a crime he did not commit. She noted that because the statement Billingsley made to the police was not tape-recorded or preserved, there was "no way to prove exactly what sort of questions were asked of Mr. Billingsley during that interview."

Billingsley was convicted of robbery in the first degree, in violation of AS 11.41.-500(a)(1). On direct appeal, Billingsley argued that his unrecorded confession should have been suppressed. This court affirmed his conviction based on its decision in *Harris v. State*, 678 P.2d 397 (Alaska App. 1984). *Billingsley I*, at 11. In *Harris*, this court rejected a *per se* suppression rule for unrecorded confessions. *Id.* at 404. Billingsley did not file a petition for hearing in the supreme court.

In November 1984, Billingsley wrote a letter to Judge Buckalew, essentially requesting the appointment of counsel for an ineffective assistance of counsel claim. Judge Buckalew entered an order on November 27, 1984, appointing the Office of Public Advocacy (OPA).

On February 4, 1985, the Alaska Supreme Court published an order in *Stephan v. State*, 705 P.2d 410 (Alaska 1985), reversing the court of appeals in *Harris*, and remanding for new trials in Stephan's and Harris' cases in which their confessions were to be suppressed. The court's order indicated that a written decision would be forthcoming.

On November 14, 1985, Assistant Public Advocate Michael Petit filed an application for post-conviction relief, arguing that Billingsley had been denied effective assistance of counsel. *Billingsley v. State*,

Memorandum Opinion and Judgment No. 1628 (Alaska App., June 29, 1988) [hereinafter *Billingsley II*]. Although the order reversing *Harris* had been published, Billingsley did not request any relief regarding his suppression claim.

On December 6, 1985, while Billingsley's application for post-conviction relief was pending before Judge Buckalew, the Alaska Supreme Court issued its opinion in *Stephan*. They held that custodial interrogations conducted in a place of detention must be recorded unless recording is not feasible. *Stephan v. State*, 711 P.2d 1156 (Alaska 1985). The court further held that the failure to record a defendant's confession will generally result in suppression of the confession. *Id.* at 1163–65.

After an evidentiary hearing on Billingsley's ineffective assistance of counsel claim, Judge Buckalew denied Billingsley's application. The Office of Public Advocacy then moved to withdraw from the case, stating that it had "fully complied with this court's order and fulfilled the purpose of its appointment." In its motion to withdraw, OPA also asked that the court re-appoint the Public Defender Agency (PDA) if further proceedings were to be conducted. Judge Buckalew ordered the withdrawal on January 27, 1986. OPA and the PDA had, and still have, an agreement whereby OPA will handle and investigate ineffective assistance of counsel claims, but once these claims are resolved, OPA will move to withdraw and let PDA handle the remaining merit issues.

Billingsley hired independent counsel and on November 17, 1986, filed a Supplemental Application for Post–Conviction Relief, seeking application of the *Stephan* decision to his case. The state's opposition to this application was based solely on the contention that the *Stephan* case should not be applied retroactively. Judge Buckalew summarily denied this application without notice. The state conceded error on appeal because of lack of notice, and the case was remanded for further proceedings. *Billingsley II*, at 3.

On remand, the state submitted a proposed notice of intent to dismiss; this notice raised the issues of waiver and harmless error. Billingsley objected and moved to strike these additional defenses. Judge Buckalew granted a hearing and granted leave to the parties to supplement the motions already before him. The state filed a motion for summary judgment raising *res judicata*, waiver, and harmless error.

Judge Buckalew denied Billingsley's application on the ground that he was not entitled to retroactive application of the *Stephan* case. The order did not address the waiver and harmless error issues. This court reversed and remanded the case for consideration of these remaining two issues. *Billingsley II.*

On remand, Judge Buckalew read his oral decision into the record on July 5, 1989. He stated that the waiver issue was easy to resolve. The matter which he referred to OPA "was whether or not there was a question of ineffective assistance of counsel." He found that he referred the matter "to address that sole issue." He concluded that he did not see "any real question in this factual situation which effectively raise[d] the waiver" issue.

Judge Buckalew found that the state's use of the confession during the robbery trial was harmless error beyond a reasonable doubt. He stated that:

Unfortunately for Mr. Billingsley the facts are that the day following the robbery he called the police department and confessed that he had robbed the Quick Stop, he was the man they were looking for and he requested that they come down and pick him up.

Judge Buckalew found that this was a "primary confession," it was given "freely and voluntarily," and did not result from interrogation. Judge Buckalew also noted that the clerk gave an accurate description of what Billingsley was wearing and that Billingsley was wearing similar clothing when he was arrested. Judge Buckalew noted that the clerk identified Billingsley in court. He concluded that under these conditions, the error in using the confession at trial was "harmless beyond a reasonable doubt." The state and Billingsley appealed to this court.

■ The state argues that Billingsley waived his right to argue the *Stephan* issue in post-conviction relief because he did not raise this issue in his first application for post-conviction relief. Alaska Rules of Criminal Procedure 35.1(h) (emphasis added) provides as follows:

(h) *Waiver of or Failure to Assert Claims.* All grounds for relief available to an applicant under this rule must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may not be the basis for a subsequent application, *unless the court finds a ground for relief asserted which for sufficient reason was not asserted* or was inadequately raised in the original, supplemental, or amended application.

In the instant case Judge Buckalew found that Billingsley had shown a "sufficient reason" why he did not raise the *Stephan* issue in his original application for post-conviction relief. Judge Buckalew stated that he appointed OPA only to investigate Billingsley's ineffective assistance of counsel claims. This order was consistent with the agreement between PDA and OPA concerning the division of representation. Judge Buckalew's conclusion is supported by the record. We accordingly find that Billingsley did not waive his right to raise the *Stephan* issue in his current application for post-conviction relief.

■ The harmless error issue raises a more difficult question. The *Stephan* decision requires the state to record custodial interrogations which occur in a place of detention. *Stephan*, 711 P.2d at 1162. The court based its decision on the due process clause contained in article I, section 7, of the Alaska Constitution. *Id.* at 1160.

Therefore, the court's error in admitting Billingsley's unrecorded confession into evidence amounts to constitutional error. In order to find constitutional error harmless, we must find the error harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In determining whether there is harmless error beyond a reasonable doubt, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 23, 87 S.Ct. at 827 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)).

■ Certainly, Billingsley had a difficult case to defend. Even if the court had suppressed the custodial statements which Billingsley made to Carter at the police station, this would not have affected the admissibility of the other admissions which Billingsley made.[1] Billingsley agreed that when Carter originally picked him up in the patrol car, he told Carter that he had committed the robbery. The testimony that Billingsley knew he had been tracked to the trailer park was equivocal. Billingsley stated that he only agreed that the event occurred after the officer told him about the tracking. In any case, these statements contained little detail. Although the statements were certainly solid evidence of Billingsley's guilt, these statements consisted of little more than Billingsley's affirmative acknowledgement that he committed the crime. The inadmissible statements which were the result of the custodial interrogation allowed the prosecutor to show that no one but the person who committed the crime could possibly have known the details which Billingsley provided. Billingsley's other confessions simply did not provide this kind of detail.

Although the case against Billingsley was strong without the confession resulting from the custodial interrogation, it was not overwhelming to the point that we

---

1. From Judge Buckalew's findings, it appears that he may have been under the impression that Billingsley made a confession to the dispatcher when he told the dispatcher that he wanted the police to come over and pick up him up. However, the dispatcher never testified at trial and the nature of the statement which Billingsley made to the dispatcher is unclear. Billingsley's statement to the dispatcher, therefore, would not have been properly admissible against him as an admission, given the evidence which was presented in this case.

would be comfortable finding that the admission of Billingsley's detailed confession was harmless error beyond a reasonable doubt. The clerk's testimony which identified Billingsley was strong. However, the clerk had picked Billingsley and one other man as possible suspects in an earlier photo lineup. Despite the dissent's claim to the contrary, the description of the robber's clothing and general appearance can hardly be said to be uniquely memorable. Billingsley did have an alibi witness. The police did not have any physical evidence which definitely connected Billingsley to the scene of the crime. Based upon our review of the evidence, we are unable to say that the admission of Billingsley's detailed confession into evidence was harmless error beyond a reasonable doubt. We accordingly reverse Judge Buckalew's conclusion that the error was harmless. We accordingly hold that Billingsley is entitled to a new trial.

REVERSED.

BRYNER, Chief Judge, dissenting.

Although I agree with the court on all other issues, I cannot subscribe to the majority's view that the admissible evidence against Billingsley was "not overwhelming to the point where we would be comfortable finding [that] admission of Billingsley's detailed confession was harmless beyond a reasonable doubt." My assessment of the admissible evidence differs significantly from that of the majority of the court and leaves me with no discomfort in finding harmless error.

Quite apart from the unrecorded, post-*Miranda* statements improperly admitted against Billingsley, the state established that Billingsley called the police and turned himself in for committing the Quick Stop robbery. Before any interrogation occurred, and without any prompting, Billingsley confessed that he had committed the robbery. Suppression of the details provided by Billingsley during the ensuing custodial interrogation, in no respect precluded the state from establishing the basic and undisputed fact that Billingsley turned

himself in and confessed to the offense for which he was convicted.

Billingsley's confession was supported by evidence that verged on being overwhelming in its own right. When Billingsley turned himself in less than two days after the offense, he was still dressed in the clothing that he wore when he robbed the Quick Stop store: dirty jeans, a dirty and worn button-up blue jean jacket, and scuffed, brown, square-toed "dingo" boots. This clothing matched precisely the description given by the robbery victim, James Oswald, immediately after the robbery. While no single item of Billingsley's clothing was unique, the combination was certainly striking and singular—sufficiently so to preclude dismissal as mere coincidence.

Billingsley's physical appearance, moreover, precisely matched the description given by Oswald, who had obtained an excellent and unobscured view of the perpetrator. Oswald was able to provide an unusually detailed description of the robber. He described a twenty-eight-year-old white male, with a ruddy complexion, about six feet tall, medium build, dark hair, a mustache, and a full untrimmed beard. Billingsley fit virtually every detail of this description save one: he was twenty-nine years old instead of twenty-eight.

Shortly after Billingsley turned himself in and confessed, Oswald was shown a photographic lineup that included a snapshot of Billingsley as well as five other individuals who were similar in appearance. Despite the similarities, Oswald was able to pick out two photographs that resembled his assailant; one of them was Billingsley.

At trial, when he confronted Billingsley personally, Oswald identified him without any equivocation; Oswald testified that he had "no doubt at all" that Billingsley was the man who had held him at gunpoint. Nor was Billingsley able to suggest any plausible reason why Oswald should have had a doubt.

Finally, undisputed evidence at trial established that shortly after the Quick Stop robbery the police attempted to track the robber with a dog. The dog led them across the street and into a trailer park

before losing the robber's scent. The place where the dog lost the scent was less than fifty feet short of the trailer where Billingsley resided.

In opposition to this evidence, Billingsley attempted to establish an alibi: that he was in his trailer, passed out from drinking, at the time of the offense. To bolster this claim, Billingsley produced Gregory Dahl, a close friend who shared the trailer with Billingsley at the time of the robbery. Dahl claimed that he was awake at 3 a.m., the time the robbery occurred, playing video games in his trailer. He said that Billingsley remained passed out next to him on the couch during that time. The state, however, thoroughly impeached Dahl's testimony. Apart from establishing that Dahl had made prior inconsistent statements to the police, the state proved that he was intoxicated on the night of the robbery and that his estimates of the time at which various events occurred that night were substantially inaccurate.

The totality of the properly admissible evidence against Billingsley leaves little room for reasonable doubt. Of course, no matter how strong the evidence, a resourceful mind can always conjure exotic reasons for acquittal. But speculation about implausible and irrational hypotheses does not advance the harmless error analysis, for in considering whether error is harmless we are bound to presume that the jury acted reasonably. *See, e.g., Hill v. Lockhart,* 474 U.S. 52, 61, 106 S.Ct. 366, 371–72, 88 L.Ed.2d 203 (1985).

Here, Oswald's unequivocal identification of Billingsley, taken in conjunction with the physical evidence, was a strong and sufficient showing of guilt, albeit not necessarily overwhelming. Defendants are routinely, though perhaps not invariably, convicted of robbery on such evidence. Add to this evidence the fact that Billingsley turned himself in and confessed his commission of the robbery, and it becomes difficult to conceive how a rational jury— one that applied its reason and common sense to the law—could have returned a verdict of acquittal.

Judge Buckalew, who had the opportunity to see and hear all of the witnesses at trial (and whose view of the evidence I believe deserves at least a modicum of deference) did not hesitate an instant before declaring that the properly admitted evidence established Billingsley's guilt, and that the failure to record Billingsley's custodial interrogation was harmless beyond a reasonable doubt. I would join in Judge Buckalew's conclusion. In my view, the suppressible statements obtained by the police during Billingsley's custodial interrogation amounted to little more than superfluous decoration on a cake that was already fully baked and well iced.

I therefore dissent.